Docket Nos. 95243, 95253, 95256, 95280 cons.–Agenda

 10–September 2003.

THE CITY OF CHICAGO 
et al.
, Appellees, v. BERETTA U.S.A. CORPORATION 
et al.
, Appellants.

Opinion filed November 18, 2004.

JUSTICE GARMAN delivered the opinion of the court:

The tragic personal consequences of gun violence are inestimable. The burdens imposed upon society as a whole in the costs of law enforcement and medical services are immense. In the present case, the City of Chicago and Cook County, in an effort to stem the rising tide of gun violence and to recoup some of the expenses that flow from gun crimes, have sued 18 manufacturers, 4 distributors, and 11 dealers of handguns that have been illegally possessed and used in the city. For various reasons, 13 manufacturers, 2 distributors, and 8 dealers remain as defendants in this case. The theory of liability is public nuisance. The relief sought by the City includes compensation for the costs of emergency medical services, law enforcement efforts, the prosecution of violations of gun control ordinances, and other related expenses. The County seeks compensation for the costs of treatment of victims of gun violence and the costs of prosecutions for criminal use of firearms, including the expenses associated with providing defense counsel to those accused of gun crimes. Both plaintiffs seek punitive damages and permanent injunctive relief to abate the alleged public nuisance.

In the circuit court of Cook County, defendants sought dismissal of the lawsuit under section 2–615 of the Code of Civil Procedure (Code) (735 ILCS 5/2–615 (West 2000)), on the basis that plaintiffs failed to state a cause of action for public nuisance. The circuit court granted the motion to dismiss.

The appellate court, construing the facts in a light most favorable to the plaintiffs, found that based on the specific acts alleged in the complaint, plaintiffs had sufficiently stated a cause of action for public nuisance against all three classes of defendants, reversed the trial court, and remanded for further proceedings. 337 Ill. App. 3d 1, 18.

We granted defendants’ petitions for leave to appeal pursuant to Rule 315(a) (177 Ill. 2d R. 315(a)). Pursuant to Supreme Court Rule 345 (155 Ill. 2d R. 345), we have permitted the National Association of Manufacturers and the Product Liability Advisory Council to file briefs 
amici curiae
 on behalf of the defendants. We have also permitted the Attorney General of the State of Illinois and the National League of Cities, along with the U.S. Conference of Mayors and the International Municipal Lawyers Association, to file briefs 
amici curiae
 on behalf of the plaintiffs.

I. BACKGROUND

Plaintiffs filed this suit in November 1998 and their first amended complaint in April 1999. On February 10, 2000, the trial court granted defendants’ motion to dismiss with respect to count II, negligent entrustment, and reserved ruling on count I, public nuisance. In March 2000, plaintiffs were permitted to file a second amended complaint. On September 15, 2000, the trial court granted defendants’ motion to dismiss both counts, with prejudice. On appeal, plaintiffs raised only the dismissal of the public nuisance count of the second amended complaint.

All of the defendants–manufacturers, distributors, and dealers–are federally licensed to engage in their respective businesses. None of the manufacturer defendants have their principal places of business in Illinois. Several are incorporated in other states for the purpose of importing firearms manufactured abroad. Only one of the distributor defendants is based in Illinois. The dealer defendants are located in Illinois, but outside the city of Chicago.

In the second amended complaint, plaintiffs offer dramatic statistics, both for the city and the nation, regarding the number of homicides and other crimes involving handguns. Relying on these statistics, they assert that the “widespread availability and use of firearms is a national problem.” They claim, further, that “[a]bsent effective enforcement and prosecution of gun control laws, firearms are readily available to anyone who wishes to use them.” The ready availability of guns also contributes to suicides and accidental shootings, particularly of children. These dangers, according to the plaintiffs, “were long ago, are today, and will continue to be specifically known to defendants.”

Plaintiffs also cite provisions of the city’s Municipal Code that place strict requirements and prohibitions on the possession, use, and transfer of firearms in Chicago and assert that such ordinances can be effective only if the “residents of the jurisdiction imposing the restriction cannot legally purchase those firearms elsewhere and bring them back into the jurisdiction.” The State of Illinois also regulates the possession, use, and transfer of firearms. However, according to the complaint, “data from recovered firearms and the undercover work of the Chicago Police Department reflect numerous and systematic violations” of these ordinances and statutes. Despite strict gun control laws intended to protect the citizens of Chicago, there are “thousands of illegal firearms” in the city and more are brought into the city every year. Thus, plaintiffs assert, the “existence of illegal firearms in the City of Chicago constitutes a public nuisance because it violates ordinances and laws designed to protect the public from a threat to its health, welfare and safety,” and because the existence of readily available firearms “creates an unreasonable and significant interference” with public safety.

The second amended complaint further alleges that all three categories of defendants are put on notice of the “crime-facilitating consequences of their conduct,” by virtue of the process used by the United States Bureau of Alcohol Tobacco and Firearms (ATF) to trace firearms recovered by federal, state, and local law enforcement agencies. According to the complaint, defendants “know that only firearms that have been used in connection with crimes can be the subject of traces.” On the basis of trace data from March 26, 1988, to December 31, 1998, involving 858,902 guns traced nationwide, 20 of the 22 manufacturer defendants “account for approximately 48.3% of those crime guns, even though they comprise only 2.8% of the 716 manufacturers listed in the national trace database.” The data provided, however, do not reveal the market shares of these manufacturers.

With regard to gun dealers, plaintiffs offer more recent data from the ATF revealing that 1.2% of dealers nationwide account for 57% of traced firearms. Plaintiffs also rely on a congressional study of ATF data released in December 1999, which found that “an extraordinary proportion of crime guns bought from ‘high crime’ gun dealers were probably straw purchased” and that “one-third of these crime guns were recovered in connection with a crime within just one year of its purchase, and half were traced to crimes within two years of their purchase.”

Plaintiffs’ specific allegation against the named dealer defendants is that they “sell firearms even when they know or should know that the firearms will be used or possessed illegally in Chicago.” This allegation is supported by assertions that dealers know some of their customers are residents of Chicago and that it is illegal for those customers to use or possess these weapons in the city; that dealers make sales even when the words or behavior of the buyers indicate an intention to use the weapon illegally; that dealers sell handguns designed to be carried as concealed weapons, even though state law prohibits the carrying of concealed weapons; and that dealers make multiple sales to individuals whom they know or should know intend to resell the guns in the city. The second amended complaint identifies the dealer defendants as part of a “core group of irresponsible dealers” who attract the business of gunrunners and other criminals, as reflected by ATF trace data. The complaint also includes factual assertions regarding numerous undercover “sting” operations carried out by police officers at the various dealer defendants’ stores. Plaintiffs further assert that the dealers’ practices “have caused a large underground market for illegal firearms to flourish in the City of Chicago,” and that they “know that many of the firearms they sell are used or possessed illegally, and put into the underground market.” Finally, the complaint states that the dealers’ “actions and omissions in selling firearms to Chicago residents that are illegal in the City of Chicago unreasonably facilitate violations of City ordinances, and contribute to physical harm, fear and inconvenience to Chicago residents, and are injurious to the public health and safety of Chicago residents.”

With regard to the defendant manufacturers and distributors, the second amended complaint alleges that they produce and distribute firearms that are regularly recovered by the Chicago police department. For each of the manufacturer defendants, the complaint lists the total number of firearms recovered by the police department from 1992 until the date of the filing of the complaint.

The tracing data offered by plaintiffs also contain a “time to crime” measurement, which reflects the number of days between the initial sale of a traced gun and its use in a crime. According to the complaint, the median “time to crime” for guns traced to distributor defendants is 834 days, while the median “time to crime” for guns traced to nondefendant distributors is 1,386 days.

In addition, the second amended complaint alleges that the defendant manufacturers and distributors knowingly oversupply or “saturate the market” with their products in areas where gun-control laws are less restrictive, knowing that persons will illegally bring them into jurisdictions where they are illegal and then possess or illegally resell them. Further, the complaint alleges that these defendants do not discourage the dealer defendants from selling their firearms irresponsibly, even though they are on notice as a result of the ATF traces that certain dealers are “responsible for a vastly disproportionate number” of the traced weapons. The defendant manufacturers and distributors “know that there is an absence of meaningful regulations of dealers” and know that “almost anyone can become a federally licensed firearms dealer.” Despite this knowledge, these defendants “fail to supervise, regulate or set standards for dealers’ conduct, instead relying on the mere fact that the dealers are licensed by the federal government.”

Finally, plaintiffs allege that the manufacturer defendants design and market their products to appeal to those who intend to use them for criminal purposes. Specifically, features such as ease of concealment, resistance to fingerprints, and the ability to fire many rounds from a single ammunition clip make certain firearms particularly attractive to criminals. These types of weapons, according to the complaint, “serve no legitimate sport or hunting purpose and are designed to appeal to criminals who wish to be better armed than other criminals or law enforcement officers.” The complaint identifies individual models manufactured by each of the manufacturer defendants as evidence of this marketing strategy, which “intentionally and recklessly causes thousands of illegal firearms to end up in Chicago.”

Based on these allegations, the second amended complaint states in “Count I: Public Nuisance” that the residents of Chicago “have a common right to be free from conduct that creates an unreasonable jeopardy to the public’s health, welfare and safety, and to be free from conduct that creates a disturbance and unreasonable apprehension of danger to person and property.” The defendants’ conduct of “intentionally and recklessly” designing, marketing, distributing, and selling firearms that they “should know” will be taken to Chicago causes “thousands of firearms to be possessed and used in Chicago illegally” and causes “a significant and unreasonable interference” with the rights of the public. Further, the complaint alleges that the conduct is of a continuing nature and has created an on-going nuisance.

The complaint also alleges that defendants “owe a duty of care to the City of Chicago and its residents and the County of Cook and its residents living within Chicago to exercise reasonable care to prevent their firearms from ending up in the hands of persons who use and possess them illegally” in the city. In addition to this allegation, which sounds in negligence, the complaint alleges that defendants’ conduct is “outrageous” and is “committed with a reckless and wanton indifference to the rights and safety of others.”

With regard to the remedy sought, the complaint states that the defendants’ conduct causes increased expenditures by the city and county that should be compensated by money damages. In addition, because money damages “will not adequately compensate” plaintiffs for the harm suffered, they do not have an adequate remedy at law. Injunctive relief is proper, plaintiffs claim, because they and the residents of the city will continue to suffer irreparable harm in the absence of an injunction.

In sum, plaintiffs’ theory is that the defendants’ conduct in designing, manufacturing, distributing, and selling certain models of handguns is done with the knowledge, if not the intent, that a significant number of the guns will ultimately find their way into an illegal secondary gun market and then into hands of persons who cannot legally possess those guns within the city of Chicago. Further, the plaintiffs allege that this conduct is unreasonable, even if it may be generally in compliance with applicable state and federal laws governing the sale of firearms, because the presence and use of these guns by the people who possess them illegally, with the substantial participation of the defendants, violates the right of the general public to be free from the threat of gun violence and from jeopardy to health and safety. Finally, plaintiffs allege that the defendants’ unreasonable conduct is the proximate cause of a substantial interference with the ability of Chicago residents to live in the city without fear, inconvenience, or undue risk of physical injury, and of the resulting demand on the plaintiffs’ limited resources.

II. ISSUES PRESENTED

Before this court, the manufacturer defendants argue that the trial court properly dismissed the second amended complaint because: (1) plaintiffs’ complaint alleges conclusions, not specific underlying facts, and thus does not conform to the fact-pleading standard; (2) the lawful sale of a nondefective product cannot, as a matter of law, constitute a public nuisance; (3) their conduct is so remote from the alleged injury that, as a matter of law, the plaintiffs cannot establish proximate cause; (4) they are not liable under public nuisance law for a situation over which they have no control, specifically, the criminal acts of others after the firearms have left their possession; (5) plaintiffs are barred from any recovery of damages in this case based on the economic loss doctrine and the doctrine prohibiting a municipality from recovering the expenses of local governmental services from alleged tortfeasors in the absence of statutory authority; and (6) the state and federal constitutions forbid the imposition of civil liability for the purpose of regulating extraterritorial commercial conduct.

The distributor defendants adopt these arguments and, with respect to (4) above, make the related argument that the claim against them sounds in negligent entrustment, not public nuisance, and because they provide firearms only to licensed dealers, not to individual consumers, they cannot be held liable for the actions of the ultimate purchaser based on negligent entrustment.

The dealer defendants make the additional argument, related to (2) above, that their practices cannot be deemed unreasonable if they are in compliance with all applicable state and federal regulations.

III. ANALYSIS

A motion to dismiss under section 2–615 of the Code (735 ILCS 5/2–615 (West 2000)) challenges the legal sufficiency of the complaint by alleging defects on its face. We, therefore, review
 de novo
 an order granting or denying a section 2–615 motion. 
Wakulich v. Mraz
, 203 Ill. 2d 223, 228 (2003). In reviewing the sufficiency of a complaint, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts
. Jarvis v. South Oak Dodge, Inc.
, 201 Ill. 2d 81, 86 (2002). In addition, we construe the allegations in the complaint in the light most favorable to the plaintiff. 
Wakulich
, 203 Ill. 2d at 228. When the plaintiff’s theory of liability is public nuisance, the pleading requirements are not exacting because the “concept of common law public nuisance *** elude[s] precise definition.” 
City of Chicago v. Festival Theatre Corp.
, 91 Ill. 2d 295, 306 (1982). The existence of a nuisance “ ‘depends on the peculiar facts presented by each case.’ ” 
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 101 (2002), quoting 
City of Chicago v. Commonwealth Edison Co.
, 24 Ill. App. 3d 624, 631-32 (1974).

A. The Common Law of Public Nuisance

Because the concept “elude[s] precise definition,” public nuisance has been “ ‘negatively defined’ ” by distinguishing it from other tort actions, such as trespass. 
Festival Theatre
, 91 Ill. 2d at 306, quoting O. Reynolds, 
Public Nuisance: A Crime in Tort Law
, 31 Okla. L. Rev. 318, 318 (1978). As one learned treatise notes:

“There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word ‘nuisance.’ It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition.” W. Keeton, Prosser & Keeton on Torts §86, at 616 (5th ed. 1984).

It is well settled, however, that public nuisance encompasses:

“that class of wrongs that arise from the unreasonable, unwarrantable or unlawful use by a person of his own property, real or personal, or from his own improper, indecent or unlawful personal conduct, working an obstruction of, or injury to, a right of another or of the public. *** It is a part of the great social compact to which every person is a party, a fundamental and essential principle in every civilized community, that every person yields a portion of his right of absolute dominion ***.” H. Wood, A Practical Treatise on the Law of Nuisances §1, at 1-3 (3d ed. 1893).

The promulgation of the Restatement of Torts in 1939 was the first “significant attempt to determine some limits to the types of tort liability” associated with nuisance. W. Keeton, Prosser & Keeton on Torts §86, at 617 (5th ed. 1984). Two lines of development in the case law were noted, one “narrowly restricted to the invasion of interests in the use or enjoyment of land,” which has come to be known as private nuisance; the other “extending to virtually any form of annoyance or inconvenience interfering with common public rights,” which is known as public nuisance. W. Keeton, Prosser & Keeton on Torts §86, at 618 (5th ed. 1984). While private nuisance is “a civil wrong, based on a disturbance of rights in land,” public nuisance is “a species of catch-all criminal offense, consisting of an interference with the rights of the community at large.” W. Keeton, Prosser & Keeton on Torts §86, at 618 (5th ed. 1984).

The Restatement definitions of public and private nuisance are consistent with Illinois law. See 
Wheat v. Freeman Coal Mining Corp.
, 23 Ill. App. 3d 14, 18 (1974) (citing Illinois cases from 1901 to support conclusion that Illinois courts have adopted the Restatement definition of nuisance); 
Gilmore v. Stanmar, Inc.
, 261 Ill. App. 3d 651, 660 (1994) (summarizing cases). See also 
Donaldson
, 199 Ill. 2d at 101 (adopting language contained in the then-draft of section 821B of the Restatement (Second) of Torts), quoting 
Commonwealth Edison
, 24 Ill. App. 3d at 631.

With regard to public nuisance, section 821B of the Restatement (Second) of Torts states: “(1) A public nuisance is an unreasonable interference with a right common to the general public.” Restatement (Second) of Torts §821B (1979). Thus, it is generally recognized that:

“A public nuisance, unlike a private nuisance, does not necessarily involve an interference with the use and enjoyment of land, or an invasion of another’s interest in the private use and enjoyment of land, but encompasses any unreasonable interference with a right common to the general public. Thus, an action for public nuisance may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights.” 58 Am. Jur. 2d
 Nuisances
 §31, at 592 (2002).

See also 
Festival Theatre
, 91 Ill. 2d at 313-15 (equitable jurisdiction to abate public nuisances exists even where such is not conferred by statute, offender is amenable to criminal law, and no property right is involved).

We therefore reject plaintiffs’ argument that their claim “squarely attacks the manner in which the defendants use their property, namely, the way in which they sell firearms from their various plants, offices, and stores.” The mere fact that defendants’ conduct in their plants, offices, and stores puts guns into the stream of commerce does not state a claim for public nuisance based on their use of land. It is the presence and use of the guns within the city of Chicago that constitutes the alleged nuisance, not the activities at the defendants’ various places of business. However, because it is clear that neither the use or misuse of land nor the invasion of property rights of another is required for a public nuisance to be found, plaintiffs’ theory of liability is not absolutely foreclosed by the existing common law of public nuisance. We, therefore, proceed to consider the legal adequacy of the second amended complaint and to address the issues raised by defendants.

B. Pleading Requirements

The manufacturer defendants argue that the appellate court, relying on the proposition that the pleading requirements in an action for public nuisance are not exacting, failed to hold the plaintiffs to the fact-pleading standard that this court has repeatedly stated is applicable to civil cases in Illinois. See,
 e.g.
, 
Weiss v. Waterhouse Securities, Inc.
, 208 Ill. 2d 439, 451 (2004) (noting that this court has stated “time and again” that Illinois is a fact-pleading jurisdiction). Specifically, these defendants claim that the only factual allegation made regarding their conduct is that they lawfully sell firearms to licensed distributors. In addition, they assert that the complaint offers no facts to support its conclusory allegations regarding their knowledge and intent. They contend that the complaint fails to plead factual allegations sufficient to state a claim as to any of the individual manufacturer defendants. In their reply brief, the distributor defendants adopt these arguments.

Further, these defendants suggest that the appellate court improperly relied upon the decision of the Supreme Court of Ohio in 
City of Cincinnati v. Beretta U.S.A. Corp.
, 95 Ohio St. 3d 416, 768 N.E.2d 1136 (2002), when it found the Ohio court’s decision to be “an analogous and instructive case that permits this type of lawsuit to go beyond the pleading stage.” 337 Ill. App. 3d at 16. Ohio is a notice-pleading state and, under the notice-pleading standard, a plaintiff is not required to plead operative facts with particularity. 
City of Cincinnati
, 95 Ohio St. 3d at 423-24, 768 N.E.2d at 1146. Rather, the complaint need only contain a short and plain statement of the claim which shows that the plaintiff is entitled to relief. If there is any set of facts consistent with the plaintiff’s complaint that would allow recovery, the court in a notice-pleading jurisdiction may not grant a defendant’s motion to dismiss on the pleadings. 
City of Cincinnati
, 95 Ohio St. 3d at 424, 768 N.E.2d at 1146.

When looking to cases from other jurisdictions to determine whether the complaint should be dismissed on the pleadings, a court must keep in mind that pleading standards vary. Fact pleading imposes a heavier burden on the plaintiff, so that a complaint that would survive a motion to dismiss in a notice-pleading jurisdiction might not do so in a fact-pleading jurisdiction. See, 
e.g.
, 
People ex rel. Madigan v. Tang
, 346 Ill. App. 3d 277, 286 (2004) (noting that in action to hold corporate officer personally liable for public nuisance, the burden of pleading facts may be “heavier” than the burden on the plaintiffs in the cited cases from other jurisdictions).

Under our fact-pleading standard, the plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action. 
Vernon v. Schuster
, 179 Ill. 2d 338, 344 (1997). “[T]he requirement that a complaint set forth facts necessary for recovery under the theory asserted is not satisfied, in the absence of the necessary allegations, by the general policy favoring the liberal construction of pleadings.” 
Teter v. Clemens
, 112 Ill. 2d 252, 256-57 (1986). Thus, in considering a motion to dismiss, a court must disregard the conclusions that are pleaded and look only to well-pleaded facts to determine whether they are sufficient to state a cause of action against the defendant. If not, the motion must be granted, “regardless of how many conclusions the count may contain and regardless of whether or not they inform the defendant in a general way of the nature of the claim against him.” 
Knox College v. Celotex Corp.
, 88 Ill. 2d 407, 426 (1981).

However, despite the requirement that the complaint must contain allegations of fact bringing the case within the cause of action, “the plaintiff is not required to set out evidence; only the ultimate facts to be proved should be alleged, not the evidentiary facts tending to prove such ultimate facts.” 
Chandler v. Illinois Central R.R. Co.
, 207 Ill. 2d 331, 348 (2003). Plaintiffs contend that they have set out such ultimate facts and suggest that if they are permitted to conduct discovery, additional supporting facts will come to light. Plaintiffs rely heavily on the facts underlying the trace data and the “time to crime” statistics which, they claim, point to these defendants as contributing to the problem of illegal guns to a degree that is not merely a function of their sales volume.

A sufficient pleading in a public nuisance cause of action will allege a right common to the general public, the transgression of that right by the defendant, and resulting injury. 
Feder v. Perry Coal Co.
, 279 Ill. App. 314, 318 (1935). To be more precise, facts must be alleged in support of four distinct elements of a public nuisance claim: the existence of a public right, a substantial and unreasonable interference with that right by the defendant, proximate cause, and injury.

A close examination of the second amended complaint reveals that factual allegations are sparse, particularly with respect to the individual manufacturer and distributor defendants. We note, however, that factual allegations with regard to the individual dealer defendants are somewhat more detailed. Although we have reservations regarding the adequacy of the second amended complaint under our fact-pleading standard, we decline to dispose of this case on a procedural issue. The questions of law raised by this appeal are of great importance, have been fully briefed and argued, and provide a substantive basis for resolving this case.

Turning to these substantive issues, we consider each of the required elements of the public nuisance cause of action in turn, beginning with the existence of a public right. Under the heading of “Unreasonable Interference,” we consider the argument that the lawful sale of a nondefective product cannot, as a matter of law, constitute a public nuisance and the related argument that defendants’ compliance with applicable state and federal laws precludes liability for public nuisance. Under heading of “Proximate Cause,” we address the argument that defendants may not be held liable in public nuisance when they have no control over the instrumentality at the time the alleged harm results from the criminal acts of third parties, as well as the argument that their conduct is too remote from the alleged injury for liability to attach. After addressing each of the elements of the claim, we consider the remedial issues raised by the defendants.

We now turn to our examination of the elements of the public nuisance cause of action to determine whether plaintiffs have stated a cause of action in which, if they were to prevail, the remedies they seek might be available.

C. Public Right

A public nuisance has been defined as “ ‘the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public.’ ” 
Village of Wilsonville v. SCA Services, Inc.
, 86 Ill. 2d 1, 21-22 (1981), quoting W. Prosser, Torts §88, at 583 n.29 (4th ed. 1971). Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the general public. Such rights include the rights of public health, public safety, public peace, public comfort, and public convenience. Restatement (Second) of Torts §821B(2)(a) (1979).

In the second amended complaint, plaintiffs allege that the residents of Chicago have “a common right to be free 
from conduct 
that creates an unreasonable jeopardy to the public’s health, welfare and safety, and to be free 
from conduct 
that creates a disturbance and reasonable apprehension of danger to person and property.” (Emphasis added.) Because none of the defendants are alleged to have engaged in any conduct in the city of Chicago, we understand the asserted public right to be the right to be free from unreasonable jeopardy to health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of illegal weapons in the city of Chicago, allegedly made possible by defendants’ action or inaction elsewhere.

Defendant manufacturers and distributors do not argue that plaintiffs have failed to identify a public right affected by the alleged nuisance. Several dealer defendants, however, argue that plaintiffs have failed to assert a recognized public right.

We note that although other courts have dismissed public nuisance suits against similar groups of defendants (see 
Spitzer v. Sturm, Ruger & Co.
, 309 A.D.2d 91, 761 N.Y.S.2d 192 (2003); 
Camden County Board of Chosen Freeholders v. Beretta U.S.A. Corp.
, 273 F.3d 536 (3d Cir. 2001) (applying New Jersey law); 
City of Philadelphia v. Beretta U.S.A. Corp.
, 277 F.3d 415 (3d Cir. 2002) (applying Pennsylvania law)), no such case has been dismissed for failure to properly plead the existence of a public right affected by the alleged nuisance.

Nevertheless, we question whether there is a public right, as opposed to an individual right, to be free from the threat of illegal conduct by others. The case law is not helpful. Cases involving the right of public safety have involved nuisances created by vicious dogs, the storage of explosives, blasting, the storage or use of fireworks, or the presence of unsafe buildings. See, 
e.g.
, 
Turpen v. City of St. Francisville
, 145 Ill. App. 3d 891 (1986) (dilapidated building); 
Village of Northbrook v. Cannon
, 61 Ill. App. 3d 315 (1978) (allowing dogs to run free). The right of public peace has been disrupted by disorderly houses, unruly taverns, and dance halls. See, 
e.g.
, 
City of Chicago v. Cecola
, 75 Ill. 2d 423 (1979) (house of prostitution); 
City of Chicago v. Clark
, 359 Ill. 374 (1935) (disorderly house); 
People v. Sequoia Books, Inc.
, 149 Ill. App. 3d 383 (1986) (lewd behavior in adult bookstore); 
Toushin v. City of Chicago
, 23 Ill. App. 3d 797 (1974) (massage parlor). Public comfort has been affected by odors, fumes, dust, and other sources of pollution. See, 
e.g.
, 
Gardner v. International Shoe Co.
, 319 Ill. App. 416 (1944) (odors, noises, smoke);
 City of Chicago v. Latronica Asphalt & Grading, Inc.
, 346 Ill. App. 3d 264 (2004) (illegal dumping of waste); 
County of Cook v. Chicago Magnet Wire Corp.
, 152 Ill. App. 3d 726 (1987) (odor). Such nuisances have affected the public generally.

 We have found no Illinois case recognizing a public right to be free from the threat that members of the public may commit crimes against individuals. Plaintiffs cite
 Cecola
 in support of their assertion that “a violation of laws that protect public health, welfare, or safety infringes a public right and hence may be remedied through a nuisance action.”
 Cecola
, however, involved an action to abate the nuisance created by the operation of a house of prostitution. The conduct itself was illegal; a statute specifically permitted houses of prostitution to be enjoined as public nuisances; and the operation of a house of prostitution was considered a nuisance at common law. 
Cecola
, 75 Ill. 2d at 427. 
Cecola
 does not offer support for recognition of a public right characterized in plaintiffs’ reply brief as “the public’s right to enjoy the benefits of the laws governing the unlawful possession and use of firearms.”

“The interference with a public right is the sine qua non of a cause of action for public nuisance. However, not all interferences with public rights are public nuisances. The nuisance must affect an interest common to the general public, must produce a common injury, or be dangerous or injurious to the general public, or it must be harmful to the public health, or prevent the public from a peaceful use of their land and the public streets, or there must be some direct encroachment on public property.” 58 Am. Jur. 2d 
Nuisances
 §39 (2002).

Further,

“A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured.” Restatement (Second) of Torts §821B, Comment 
g
, at 92 (1979).

In 
Ganim v. Smith & Wesson Corp.
, 258 Conn. 313, 780 A.2d 98 (2001), the Supreme Court of Connecticut resolved a case similar to the present case on the threshold question of whether the plaintiff mayor and city had standing to assert a claim of public nuisance. 
Ganim
, 258 Conn. at 343-44, 780 A.2d at 117. The Connecticut court also commented that:

“ ‘Nuisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights, that is, the rights enjoyed by citizens as part of the public. ... [I]f the annoyance is one that is common to the public generally, then it is a public nuisance. ... The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence.’ ”
 Ganim
, 258 Conn. at 369, 780 A.2d at 131-32, quoting 
Higgins v. Connecticut Light & Power Co.
, 129 Conn. 606, 611, 30 A.2d 388, 391 (1943).

The Connecticut court acknowledged that the definition of a common law public nuisance might be “capacious enough” to encompass the plaintiffs’ complaint: “One might well say that the harms alleged by the plaintiffs to have been caused by the defendants’ conduct are harms that injure the citizens of Bridgeport who may be so circumstanced as to come within the influence of that conduct.” 
Ganim
, 258 Conn. at 370, 780 A.2d at 132. One might also say, however, that the harm alleged was harm to individual members of the public, not to the public generally.

In the second amended complaint, plaintiffs describe the harms that they allege result from the possession and use of illegal firearms in the city of Chicago: “a higher level of crime, death and injuries to Chicago citizens, a higher level of fear, discomfort and inconvenience to the residents of Chicago, and increased costs to the plaintiffs to investigate and prosecute crimes caused by the illegal possession and use of the firearms brought into Chicago.”

Leaving aside for a moment the costs incurred by plaintiffs, which we determine, below, are not recoverable as damages, we query whether the public right asserted by plaintiffs is merely an assertion, on behalf of the entire community, of the individual right not to be assaulted. See, 
e.g.
, Restatement (Second) of Torts §821B, Comment 
g
, at 92 (1979) (a public right is “not like the individual right that everyone has not to be assaulted”). We are also reluctant to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it.

By posing this question, we do not intend to minimize the very real problem of violent crime and the difficult tasks facing law enforcement and other public officials. Nor do we intend to dismiss the concerns of citizens who live in areas where gun crimes are particularly frequent. Rather, we are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another.

For example, the purchase and consumption of alcohol by adults is legal, while driving under the influence is a crime. If there is public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

Similarly, cell phones, DVD players, and other lawful products may be misused by drivers, creating a risk of harm to others. In an increasing number of jurisdictions, state legislatures have acted to ban the use of these otherwise legal products while driving. A public right to be free from the threat that other drivers may defy these laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others.

We conclude that there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs. Further, because we conclude, below, that plaintiffs’ claim does not meet all of the required elements of a public nuisance action, we need not decide whether to break new ground by creating such precedent.

D. Unreasonable Interference

“Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is 
of a continuing nature 
or has produced a permanent or long-lasting effect, 
and
, as the actor knows or has reason to know, has a 
significant effect
 upon the public right.” (Emphases added.) Restatement (Second) of Torts §821B(2) (1979).

We understand plaintiffs’ claim of unreasonable interference to be based on section 821B(2)(c), because their complaint alleges that defendants’ “conduct in designing, marketing, distributing, and selling firearms to Chicago residents or to persons whom defendants know will cause those firearms to end up in Chicago is 
of a continuing nature
.” (Emphasis added.) The second amended complaint describes the “significant effect” of defendants’ conduct as: “a higher level of crime, death and injuries to Chicago citizens, a higher level of fear, discomfort and inconvenience to the residents of Chicago, and increased costs to the plaintiffs.” The complaint also avers that illegal firearms “are used in the commission of crimes, including crimes in which residents of Chicago are killed, maimed, or terrorized.” In addition, the complaint contains data regarding the number of homicides, robberies, and other crimes involving handguns, both in the city and nationwide. Data are offered regarding the ready availability of handguns to those who are forbidden by law to possess them. The significance of the problem is further demonstrated by citations to numerous state statutes intended to curb gun violence.

Defendants assert that in more than 2,500 reported cases in the over-100-year history of public nuisance law in Illinois, a public nuisance has been found to exist only when one of two circumstances was present: either the defendant’s conduct in creating the public nuisance involved the defendant’s use of land, or the conduct at issue was in violation of a statute or ordinance. Thus, they argue, even though an action for public nuisance may lie without allegations that the nuisance emanates from the defendants’ use of land, the law of public nuisance does not encompass conditions that eventuate from the lawful manufacture, distribution, and sale of a nondefective product.

Although we have not attempted to verify defendants’ claim that the body of law on this topic in state and federal courts applying Illinois law exceeds 2,500 cases, we have found no Illinois case in which a public nuisance was found in the absence of one of these two conditions. While no case law in this jurisdiction expressly limits application of the doctrine of public nuisance to these two circumstances, no case law expressly authorizes its application in the absence of either condition. To do so would be to expand the law of nuisance to encompass a third circumstance–the effect of lawful conduct that does not involve the use of land. We are reluctant to allow such an expansion.

 With this reluctance in mind, we turn to the two arguments made by defendants challenging the appellate court’s conclusion that plaintiffs have properly pleaded the element of unreasonable interference.

1. 
Lawful Sale of Nondefective Product

Defendants argue that, as a matter of law, the lawful production and sale of a nondefective product is 
per se
 reasonable and, thus, cannot result in liability for creation of a public nuisance. The appellate court responded to this argument by citing section 834 of the Restatement: “ ‘One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent to carrying it on.’ ” 337 Ill. App. 3d at 15, quoting 
City of Bloomington, Indiana v. Westinghouse Electric Corp.
, 891 F.2d 611, 614 n.5 (7th Cir. 1989), citing Restatement (Second) of Torts §834 (1979). The appellate court also noted that a federal court deciding a case of first impression under Illinois law had previously declined to impose public nuisance liability against a gun manufacturer in the absence of state decisional law. 337 Ill. App. 3d at 14, citing 
Bubalo v. Navegar, Inc.
, No. 96–C–3664 (N.D. Ill. March 20, 1998). Then, relying on 
City of Cincinnati
, the appellate court rejected defendants’ argument. The Supreme Court of Ohio, in 
City of Cincinnati
, allowed a public nuisance claim against a similar group of defendants to stand, holding that, “under the Restatement’s broad definition, a public-nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interfere[ ] with a right common to the general public.” 
City of Cincinnati
, 95 Ohio St. 3d at 520, 768 N.E.2d at 1142.

Plaintiffs’ novel application of the cause of action of public nuisance renders authorities such as the Restatement less than helpful in answering this question. Section 834, for example, focuses primarily on private nuisance and its common law basis tied to a defendant’s use of land and the resulting invasion a plaintiff’s property rights. The “Scope Note” preceding section 834 states that the defendant’s activity “may be the direct cause of the invasion or it may create a 
physical condition
 that ultimately results in the invasion.” (Emphasis added.) Restatement (Second) of Torts §834 (1979). All of the illustrations that follow section 834 involve invasions of property rights caused by the defendant’s use of land and are clearly predicated on a view of nuisance as a physical condition brought about by the wrongful use of real property.

Similarly, the assertion in manufacturer defendants’ brief that a “ ‘product which has caused injury cannot be classified as a nuisance to hold liable the manufacturer or seller for the product’s injurious effects’ ” (quoting 63A Am. Jur. 2d 
Products Liability
 §927, at 105 (1997)) is not entirely helpful when a 
public
 nuisance is alleged. The cited authority also states that:

“Because a seller in a commercial transaction relinquishes ownership and control of its products when they are sold, it lacks the legal right to abate whatever hazards its products may pose. Under these circumstances, the purchaser’s proper remedies are products liability actions for negligence or breach of warranty rather than a nuisance action.” 63A Am. Jur. 2d 
Products Liability 
§927, at 106 (1997).

Clearly, this authority is considering whether the purchaser of a product may state a nuisance claim for injuries caused by the product. Neither the plaintiffs in the present case, nor the citizens injured by the firearms that have been manufactured, distributed, and sold by the defendants, are purchasers seeking to assert a public nuisance claim when an action for products liability or breach of warranty would be more appropriate.

Plaintiffs concede that their public nuisance claim, based on the alleged effects of defendants’ lawful manufacture and sale of firearms outside the city and the county, would extend public nuisance liability further than it has been applied in the past. Nevertheless, they, and the 
amici
 in support of their position, argue that extending the doctrine of public nuisance in this manner is a proper exercise of this court’s inherent authority to develop the common law. Further, they claim, the legislature has expressed no intent to foreclose common law liability for marketing, distribution, and sales practices that create a public nuisance.

The Supreme Court of Indiana has agreed with this approach, holding in 
City of Gary v. Smith & Wesson Corp.
, 801 N.E.2d 1222, 1234 (Ind. 2003), that “a nuisance claim may be predicated on a lawful activity conducted in such a manner that it imposes costs on others.” We do not find 
City of Gary
 convincing, however, because the authority cited for this statement, 
Yeager & Sullivan, Inc. v. O’Neill
, 163 Ind. App. 466, 474-75, 324 N.E.2d 846, 852 (1975), involved a nuisance created by the keeping of hogs, a lawful enterprise, in a manner that invaded the rights of others. Again, it was the manner in which the defendant used his real property, and the effect of his conduct on plaintiff’s use and enjoyment of his real property, that resulted in imposition of nuisance liability in 
Yeager & Sullivan
.

The other authorities offered by plaintiffs do not directly address defendants’ contention that plaintiffs’ claim is, in effect, a products liability claim repackaged as public nuisance. Because a products liability claim against one who lawfully manufactures and sells a nondefective product must fail (see 
Riordan v. International Armament Corp.
, 132 Ill. App. 3d 642 (1985); 
Linton v. Smith & Wesson
, 127 Ill. App. 3d 676 (1984)), defendants urge this court to conclude that plaintiffs have failed to state a cause of action in public nuisance and to leave to the legislature the question of whether to impose additional constraints on the marketing and sale of firearms.

Cases from other jurisdictions in which reviewing courts have rejected public nuisance claims against the gun industry offer more analysis of this question. In 
Spitzer v. Sturm, Ruger & Co.
, a New York appellate court observed:

“[G]iving a green light to a common-law public nuisance cause of action today will, in our judgment, likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities.

All a creative mind would need to do is construct a scenario describing a known or perceived harm of a sort that can somehow be said to relate back to the way a company or an industry makes, markets, and/or sells its non-defective, lawful product or service, and a public nuisance claim would be conceived and a lawsuit born.” 
Spitzer
, 309 A.D.2d at 96, 761 N.Y.S.2d at 196.

Citing an earlier case rejecting a theory of negligent marketing against a gun manufacturer, the
 Spitzer 
court observed that “ ‘judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another.’ ” 
Spitzer
, 309 A.D.2d at 95-96, 761 N.Y.S.2d at 196, quoting 
Hamilton v. Beretta USA Corp.
, 96 N.Y.2d 222, 233, 750 N.E.2d 1055, 1061, 727 N.Y.S.2d 7, 13 (2001). This concern, the court, noted, “is common to both negligent marketing and public nuisance claims.” 
Spitzer
, 309 A.D.2d at 95-96, 761 N.Y.S.2d at 196.

Similarly, a federal court of appeals, applying New Jersey law, concluded that:

“Whatever the precise scope of public nuisance law in New Jersey may be, no New Jersey court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products that are lawfully placed in the stream of commerce. On the contrary, the courts have enforced the boundary between the well-developed body of product liability law and public nuisance law. Otherwise, if public nuisance law were permitted to encompass product liability, nuisance law ‘would become a monster that would devour in one gulp the entire law of tort,’ [citation]. If defective products are not a public nuisance as a matter of law, then the non-defective, lawful products at issue in this case cannot be a nuisance without straining the law to absurdity.” 
Camden County Board
, 273 F.3d at 540.

In addition, a Florida appellate court affirmed the trial court’s dismissal of Miami-Dade County’s action against firearms manufacturers, trade associations, and retailers, saying:

“The County’s request that the trial court use its injunctive powers to mandate the redesign of firearms and declare that the appellees’ business methods create a public nuisance, is an attempt to regulate firearms and ammunition through the medium of the judiciary.” 
Penelas v. Arms Technology, Inc.
, 778 So. 2d 1042, 1045 (Fla. App. 2001).

A Florida statute expressly reserves the field of regulation of firearms and ammunition to the state legislature (Fla. Stat. §790.33 (1999)). In Illinois, cities and counties are free to impose gun regulations within certain limits (see 720 ILCS 5/47–5 (West 2002)). Nevertheless, we agree with defendants that the Florida court’s observation is worthy of consideration.

Defendants’ position is that the legislative and executive branches of state and federal government are better suited than this court to address the societal costs that flow from the illegal use of handguns, particularly given that the commercial activity at issue is already highly regulated. Further, defendants argue that plaintiffs’ “frustration” at their inability to effectively regulate gun possession in the city cannot be “alleviated through litigation as the judiciary is not empowered to ‘enact’ regulatory measures in the guise of injunctive relief. The power to legislate belongs not to the judicial branch of government, but to the legislative branch.” 
Penelas
, 778 So. 2d at 1045.

Our own research reveals that the Criminal Code contains a nuisance provision listing 17 categories of conduct or uses of land that are public nuisances. 720 ILCS 5/47–5 (West 2002). In addition, the General Assembly has enacted numerous other statutes defining certain conduct as constituting a public nuisance. See,
 e.g.
, 510 ILCS 5/15(c) (West 2002) (permitting a dangerous dog or other animal from leaving the premises of the owner without a leash or other method of control); 515 ILCS 5/1–215 (West 2002) (use of illegal fishing device); 605 ILCS 5/9–108 (West 2002) (planting of willow trees or hedges on the margin of a highway); 620 ILCS 25/11 (West 2002) (creation of a hazard that obstructs the airspace required for the take-off or landing of aircraft); 625 ILCS 45/4–8 (West 2002) (use of watercraft equipped with siren or flashing lights); 720 ILCS 5/28–2 (West 2002) (keeping a gambling place); 720 ILCS 5/37–1 (West 2002) (knowingly maintaining a building used in the commission of certain enumerated criminal offenses).

As these examples well illustrate, the legislature has the power to declare something to be a nuisance that was not such at common law. 
People v. Jones
, 329 Ill. App. 503 (1946); 
Village of Gurnee v. Depke
, 114 Ill. App. 2d 162 (1969). However, the codification of certain common law nuisances in the Criminal Code and the legislative declaration that certain other conditions constitute nuisances does not exclude common law nuisances not codified therein from being classed as public nuisances. 
People ex rel. Dyer v. Clark
, 268 Ill. 156 (1915). See also 
Gilmore
, 261 Ill. App. 3d at 661 (public nuisance statute does not displace common law actions; common law right to action to abate public nuisance exists independently of any statutory right). As this court observed in 
Festival Theatre
:

“[E]quitable jurisdiction to abate public nuisances is said to be of ‘ancient origin,’ and it exists even where not conferred by statute, where the offender is amenable to the criminal law, and where no property rights are involved. [Citations.] Too, in a common law action, the extent of the concept of public nuisance is not limited to those activities the legislature has declared public nuisances.” 
Festival Theatre
, 91 Ill. 2d at 303.

On the other hand:

“If a defendant’s conduct in interfering with a public right does not come within one of the traditional categories of the common law crime of public nuisance or is not prohibited by a legislative act, the court is acting without an established and recognized standard.” Restatement (Second) of Torts §821B, Comment 
e
, at 90 (1979).

In such cases, the Restatement warns, the analysis set forth in sections 826 to 831 becomes more significant. Restatement (Second) of Torts §821B, Comment 
e
, at 90 (1979). These sections define factors that should be considered by a court when determining whether an intentional invasion of another’s interest in the use and enjoyment of land is unreasonable. Restatement (Second) of Torts §826 (unreasonableness of intentional invasion), §827 (gravity of harm), §828 (Utility of Conduct), §§829 through 831 (gravity versus utility) (1979).

Because these factors are intended to apply to intentional conduct affecting the use and enjoyment of land, they are not directly applicable to the novel claim made by plaintiffs. Thus, if we were to engage in the balancing of harm versus utility that the plaintiffs urge, we would be “acting without an established and recognized standard” (Restatement (Second) of Torts §821B, Comment 
e
, at 90 (1979)). In addition, although courts frequently weigh such factors in other contexts, an analysis of the harm caused by firearms versus their utility is better suited to legislative fact-finding and policymaking than to judicial assessment.

Further, despite the existence of numerous statutes declaring various practices and conditions to constitute public nuisances, we have no indication from the legislature that it would be inclined to impose public nuisance liability for the sale of a product that may be possessed legally by some persons, in some parts of the state. It seems that plaintiffs seek injunctive relief from this court because relief has not been forthcoming from the General Assembly. We are reluctant to interfere in the lawmaking process in the manner suggested by plaintiffs, especially when the product at issue is already so heavily regulated by both the state and federal governments.

We, therefore, conclude that there are strong public policy reasons to defer to the legislature in the matter of regulating the manufacture, distribution, and sale of firearms.

2. 
Compliance with Applicable Law

Defendants argue further that their business practices cannot be deemed unreasonable if they are in compliance with applicable state and federal regulations. In a related argument, defendants suggest that because the firearms industry is highly regulated at both the state and federal levels, judicial restraint in further regulating their activities is advisable.

As to the argument that compliance with applicable laws precludes a claim of common law public nuisance because it is, by definition, reasonable, the appellate court concluded that “compliance with the law is not dispositive of whether a public nuisance exists, but merely serves as a ‘guideline’ in determining whether an unreasonable interference has occurred.” 337 Ill. App. 3d at 13. The authority cited for this statement, however, was not persuasive. The appellate court cited its own recent decision in 
Young v. Bryco Arms
, 327 Ill. App. 3d 948 (2001), a case virtually identical to the present case except that it was brought by private individuals, and a law review article by one of plaintiffs’ own attorneys (D. Kairys, 
The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law
, 32 Conn. L. Rev. 1175, 1182 (2000)). The only other authority cited by the appellate court for this proposition is 
Commonwealth Edison
, 24 Ill. App. 3d at 632-33, in which the court concluded that although the defendant demonstrated that it was in compliance with applicable standards, the court was “not bound by federal air-pollution standards in deciding whether the facility’s emissions constitute a common law nuisance.” Rather, the court stated, “those standards offer us guidelines in the determination of the reasonableness of the operation and the extent of any harm to the public.” In
 Commonwealth Edison
, however, the appellate court affirmed the trial court’s dismissal of the city’s public nuisance claim against an alleged polluter on other grounds, specifically, lack of proof of both substantial injury and causation. 
Commonwealth Edison
, 24 Ill. App. 3d at 633. Thus, the commentary in 
Commonwealth Edison
 on the relevance of defendant’s compliance with federal regulations was 
dicta
 and of little persuasive value to this court.

As to the argument that comprehensive regulation of the firearms industry cautions against judicial involvement, the appellate court commented that defendant’s alleged fostering of an underground handgun market is “not [a] lawful action.” 337 Ill. App. 3d at 13. The appellate court acknowledged that “comprehensive legislation of a certain activity causes courts to exercise judicial restraint in declaring an activity to be a public nuisance if it complies with the regulations.” 337 Ill. App. 3d at 13. However, the court found such restraint unjustified in the present case because “ ‘ “there is generally no regulation of the quantity, frequency, or purpose of firearm purchases or sales[,] nor is there any national registration of purchasers of firearms. Multiple sales and even straw purchases are generally not unlawful and are not significantly regulated.” ’ ” 337 Ill. App. 3d at 13, quoting 
Young
, 327 Ill. App. 3d at 967, quoting D. Kairys, 
The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law
, 32 Conn. L. Rev. at 1183. Again, this conclusion is taken from a law review article written by one of plaintiffs’ attorneys and, as such, is entitled to little, if any, consideration by this court. In addition, we find the appellate court’s conclusion regarding the regulation of firearms purchases to be inaccurate. State and federal regulation of handgun sales is extensive. See 18 U.S.C. §921 
et seq. 
(2000) (Gun Control Act); 430 ILCS 65/0.01 
et seq.
 (West 2002) (Firearm Owners Identification Card Act). Indeed, the second amended complaint acknowledges that the “State of Illinois is a high regulation state.”

Plaintiffs respond that the federal Gun Control Act expressly provides that it does not preempt state or local laws. 18 U.S.C. §927 (2000). They also call our attention to 
Kalodimos v. Village of Morton Grove
, 103 Ill. 2d 483 (1984), in which this court rejected the argument that state laws regulating firearms are so comprehensive that they evince a legislative intent to preclude municipalities from imposing other restrictions of firearms.

The Gun Control Act and 
Kalodimos
, however, refer to state and local laws and municipal ordinances and, as such, anticipate legislative action, not judicial intervention. They offer support for defendants’ observation that a court should be reluctant to use its equitable powers to impose an injunctive remedy on an activity that is already highly regulated by statute. As the drafters of the Restatement commented:

“[I]f there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations. *** The variety and complexity of a problem and of the interests involved and the feeling that the particular decision should be a part of an overall plan prepared with a knowledge of matters not presented to the court and of interests not represented before it, may also promote judicial restraint and a readiness to leave the question to an administrative agency if there is one capable of handling it appropriately.” Restatement (Second) of Torts §821B, Comment 
f
, at 91-92 (1979).

Plaintiffs apparently would prefer other forms of regulation, as demonstrated by the nature of the injunctive relief they seek. Litigation should not be used to achieve legislative goals. Nonetheless, we turn to the merits of defendants’ argument that public nuisance liability may not be imposed because their compliance with existing statutory schemes renders their conduct, by definition, reasonable.

Defendants point to 
Meyers v. Kissner
, 149 Ill. 2d 1, 10 (1992), as authority for their contention that a lawful act cannot constitute a public nuisance. In 
Meyers
, the plaintiff landowner sought injunctive relief against adjacent landowners who constructed a levee that altered the natural flow of water across his land, causing erosion. The construction was not prohibited by law at the time. Indeed, a statute specifically provided that a levee existing before a certain date could be maintained and repaired without a permit. 
Meyers
, 149 Ill. 2d at 10. This court concluded that: “[I]t is by no means true that an act constituting a nuisance must necessarily be in itself unlawful. While a lawful act will not constitute a public nuisance, it can nonetheless constitute a private nuisance.” 
Meyers
, 149 Ill. 2d at 10.

In addition, defendants call our attention to a comment to section 821B of the Restatement: “Although it would be a nuisance at common law, conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability.” Restatement (Second) of Torts §821B, Comment 
f
, at 91 (1979).

Finally, defendants offer 
Gilmore v. Stanmar
 for the proposition that when the defendant’s conduct is governed by comprehensive laws and regulations, a public nuisance may be found only if the plaintiff establishes that the defendant failed to comply with the law or was otherwise negligent in carrying out the activity. The alleged nuisance in
 Gilmore
 was a pedestrian canopy adjacent to a construction site, which extended into the street, obstructing motorists’ vision and their ability to maneuver.
 Gilmore
, 261 Ill. App. 3d at 653. The defendants had obtained the proper permit for construction of the canopy and argued that they, therefore, could not be held liable for a resulting accident. 
Gilmore
, 261 Ill. App. 3d at 654. The appellate court concluded that plaintiffs’ claims for negligence and common law public nuisance were improperly dismissed by the trial court. 
Gilmore
, 261 Ill. App. 3d at 659, 662. With regard to the nuisance claim, the court said:

“[T]he existence of an ordinance or other law purportedly making a nuisance legal does not automatically destroy a common law nuisance action where the defendant’s conduct was not in compliance with the law, where the defendant was otherwise negligent, or where the law itself is invalid for allowing a nuisance.” 
Gilmore
, 261 Ill. App. 3d at 661.

We conclude that it is possible to create a public nuisance by conducting a lawful enterprise in an unreasonable manner. If, however, as in the present case, the enterprise is highly regulated by state or federal law, the 
Gilmore
 rule provides the proper framework for addressing the unreasonable interference element of a public nuisance claim. Under the 
Gilmore
 rule, this element can be met only by the plaintiff’s pleading and proving that (1) the defendant violated the applicable statutes or regulations, (2) the defendant was otherwise negligent in carrying out the enterprise, or (3) the law regulating the defendant’s enterprise is invalid. 
Gilmore
, 261 Ill. App. 3d at 661.

As there is no suggestion that state and federal regulations regarding firearms are invalid, we consider whether plaintiffs have properly pleaded the unreasonable interference element under either the first or second prongs of the 
Gilmore
 rule.

The second amended complaint contains no specific factual allegations of actual violations of applicable statutes and regulations by any of the named defendants. The complaint asserts that “[a]bsent effective enforcement and prosecution of gun control laws, firearms are readily available to anyone who wishes to use them.” We do not question the accuracy of this statement, but it does not specifically implicate these defendants. Plaintiffs also plead that “data from recovered firearms and the undercover work of the Chicago Police Department reflect numerous systemic violations of the aforementioned statutes,” but do not allege that these particular defendants committed the violations. Further, plaintiffs claim that “[d]espite strict gun control laws protecting the plaintiffs’ citizens in Chicago, there are thousands of illegal firearms in existence in the City of Chicago.” Again, the second amended complaint alleges lawbreaking, but not by any of these defendants. Finally, the allegations regarding specific sales transactions by the individual dealer defendants stop short of alleging violations of applicable statues and regulations. We conclude, therefore, that plaintiffs have not stated a claim for public nuisance predicated on violations of applicable law.

Plaintiffs argue that they have sufficiently alleged negligent conduct that has caused unreasonable interference with public rights. Under our application of the 
Gilmore
 rule in the context of a highly regulated industry, a claim for public nuisance may stand if the defendant was negligent in his operation of the enterprise.

The appellate court did not consider whether plaintiffs had properly pleaded a claim for public nuisance predicated on defendants’ negligently, and therefore unreasonably, creating a significant effect on a public right. 337 Ill. App. 3d at 13 (“[P]laintiffs here do not allege that defendants are liable under theories of negligence or strict liability. Instead, their public nuisance claims allege defendants’ intentional and unreasonable conduct”). Plaintiffs’ brief disputes this conclusion, asserting that they have properly pleaded a public nuisance claim predicated on negligence. We agree that the second amended complaint does contain allegations that sound in negligence.

Thus, we turn to the assertion of defendant manufacturers and distributors that a claim based on negligence, whether the theory of liability is nuisance or any other species of tort liability, may not lie in the absence of a duty owed by the defendant. 
Washington v. City of Chicago
, 188 Ill. 2d 235, 239 (1999) (stating that, as a matter of law, a plaintiff may not recover in a negligence action unless a duty is owed to her by the defendant). Specifically, they rely on 
Riordan
, 132 Ill. App. 3d at 647 (manufacturers and distributors of handguns owed no duty to plaintiffs in wrongful-death action to control the distribution of their products), and 
Linton
, 127 Ill. App. 3d at 678-79 (manufacturer of nondefective firearm has no duty to plaintiff in personal injury action to control the distribution of its product to the general public), which, they argue, preclude any reliance on allegations of negligence as the underpinning of a public nuisance claim.

“Whether a duty of care exists is a question of law to be determined by the court.”
 Bajwa v. Metropolitan Life Insurance Co.
, 208 Ill. 2d 414, 422 (2004). The question turns largely on public policy considerations, informed by consideration of four traditional factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. 
Bajwa
, 208 Ill. 2d at 427.

Plaintiffs’ second amended complaint asserts, in the section headed “Nature of the Action,” that defendants “have breached their duty to not sell or supply firearms to Chicago residents who[m] they know or have reason to know will illegally use, possess, transfer, or resell the firearms in Chicago and have thus circumvented the Chicago ordinances and other gun control laws governing use or possession of firearms in Chicago.” Under the heading “COUNT ONE: PUBLIC NUISANCE,” the second amended complaint alleges that:

“Defendants owe a duty of care to the City of Chicago and its residents and the County of Cook and its residents living within Chicago to exercise reasonable care to prevent their firearms from ending up in the hands of persons who use and possess them illegally in the City of Chicago in light of the direct, foreseeable, and serious consequences of their actions.”

With regard to the four traditional factors, the complaint further alleges that: (1) “it is reasonably foreseeable to the defendants that their conduct will cause deaths and injuries to Chicago residents and otherwise significantly and unreasonably interfere with public health, safety and welfare”; (2) defendants’ conduct creates a “strong likelihood that these illegal firearms will cause deaths and injuries to Chicago residents”; (3) the burden of “taking measures to stem the flow of illegal weapons into Chicago is not undue,” consisting only of the loss of sales to those likely to use or possess weapons illegally; and (4) stemming the flow of illegal guns into the city will “save lives and prevent injuries, and it will make the City of Chicago and County of Cook safer places to live.”

Plaintiffs’ brief to this court does not return to this factor-based analysis of the existence of a duty, nor does it cite cases that have applied this analysis to find that public policy weighs in favor of judicial recognition of an heretofore unrecognized duty. See, 
e.g.
, 
Bajwa
, 208 Ill. 2d at 427-28 (placing a duty of due care upon an insurance company to advise a proposed insured of a policy taken out by another on his life). Instead, plaintiffs distinguish
 Riordan
 and 
Linton 
on the basis that these are simply negligence cases, not public nuisance cases, and that their nuisance claim is made “under a very different duty than the duty at stake in these private negligence actions.” The duty asserted in the second amended complaint, they argue, is a duty owed to the public at large, rather than to a specific member of the public, as was the case in 
Riordan 
and 
Linton
.

Applying the four traditional factors (
Bajwa
, 208 Ill. 2d at 427), in light of public policy, we find no duty owed to the public at large, at least with respect to the manufacturer and distributor defendants. It is reasonably foreseeable, in a nation that permits private ownership of firearms, that criminals will obtain guns and it is not only likely, but inevitable, that injuries and death will result. It is less foreseeable to these defendants that the criminal conduct of individuals who illegally take firearms into a particular community will result in the creation of a public nuisance there. Further, despite plaintiffs’ suggestion that the only burden they would place on defendants is the loss of sales to criminals, the magnitude of the burden that plaintiffs seek to impose on the manufacturer and distributor defendants by altering their business practices is immense. Finally, plaintiffs predict only positive consequences if this duty is recognized–the city will be safer and lives will be saved. Such positive consequences are speculative at best, being based on the assumption that criminals will not be able to obtain guns manufactured by other companies and sold by other dealers. The negative consequence of judicially imposing a duty upon commercial enterprises to guard against the criminal misuse of their products by others will be an unprecedented expansion of the law of public nuisance. See 
Spitzer
, 309 A.D.2d at 104-05, 761 N.Y.S.2d at 202-03 (expanding the reach of common law public nuisance in the manner urged by plaintiff would reach well beyond these defendants to “countless other types of commercial enterprises, in order to address a myriad of societal problems”).

We hold, therefore, that with respect to the defendant manufacturers and distributors, plaintiffs have failed to state a cause of action for public nuisance predicated on negligence, because these defendants owe no duty to the city of Chicago or its residents to prevent their firearms from “ending up in the hands of persons who use and possess them illegally.” This result is consistent with 
Riordan 
and
 Linton
, in which the theories of liability included, 
inter alia
, negligence, products liability, and negligent distribution, but did not include public or private nuisance. The appellate court in these cases held that the defendant firearms manufacturers and distributors owed no duty to individual members of the public to control the distribution of handguns.
 Riordan
, 132 Ill. App. 3d at 647;
 Linton
, 127 Ill. App. 3d at 679.

The second amended complaint does contain specific factual allegations regarding transactions engaged in by the dealer defendants that, although not illegal, are suggestive of a willingness to serve customers who may intend to circumvent the law. Thus, the first factor, reasonable foreseeability of injury (
Bajwa
, 208 Ill. 2d at 427), is arguably stronger with respect to the dealer defendants than with respect to the other groups of defendants. In addition, the relief sought against the dealer defendants is somewhat less burdensome. Only the fourth factor, the consequences of placing that burden on the defendant (
Bajwa
, 208 Ill. 2d at 427), weighs heavily against imposing a duty upon the dealer defendants. The decisions in 
Riordan
 and 
Linton
 are not relevant because neither case involved a defendant who was a retailer of firearms. Because the question of foreseeability plays a pivotal role not only in the question of the existence of a duty but also in the determination of legal cause, we leave this question unanswered for the moment and turn to the question of whether plaintiffs have sufficiently pleaded the element of proximate cause with respect to the dealer defendants.

E. Proximate Cause

Leaving aside the question of duty, the remaining element of the public nuisance claim that must be present before injunctive relief against the dealer defendants may be available is “resulting injury” (see 
Gilmore
, 261 Ill. App. 3d at 661), or, more precisely, proximate cause. The term “proximate cause” encompasses two distinct requirements: cause in fact and legal cause. 
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455 (1992). The first requirement, cause in fact, is present “when there is a reasonable certainty that a defendant’s acts caused the injury or damage.” 
Lee
, 152 Ill. 2d at 455. In deciding this question, we first ask whether the injury would have occurred absent the defendant’s conduct. 
Lee
, 152 Ill. 2d at 455. In addition, when, as here, there are multiple factors that may have combined to cause the injury, we ask whether defendant’s conduct was a material element and a substantial factor in bringing about the injury. 
Lee
, 152 Ill. 2d at 455.

The second requirement, legal cause, is established only if the defendant’s conduct is “ ‘so closely tied to the plaintiff’s injury that he should be held legally responsible for it.’ ” 
Simmons v. Garces
, 198 Ill. 2d 541, 558 (2002), quoting
 McCraw v. Cegielski
, 287 Ill. App. 3d 871, 873 (1996). The question is one of policy–How far should a defendant’s legal responsibility extend for conduct that did, in fact, cause the harm? 
Simmons
, 198 Ill. 2d at 558. See W. Keeton, Prosser & Keeton on Torts §41, at 264 (5th ed. 1984) (“As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy”). The proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct. 
Lee
, 152 Ill. 2d at 456.

Although proximate cause is generally a question of fact (
Lee
, 152 Ill. 2d at 455), the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause (
Harrison v. Hardin County Community Unit School District No. 1
, 197 Ill. 2d 466, 476 (2001)).

The appellate court briefly addressed the question of causation, concluding that a “reasonable trier of fact could find that the criminal misuse of guns to kill persons were occurrences that defendants knew would result or were substantially certain to result from the defendants’ alleged conduct.” 337 Ill. App. 3d at 18. It is unclear whether this statement is intended to refer to cause in fact, or legal cause, or to both. The mention of the trier of fact suggests that the appellate court was considering the question of cause in fact, but the appellate court did not determine whether plaintiffs had properly pleaded cause in fact by alleging that defendants’ conduct was a material element and a substantial factor in bringing about the alleged harm, or that the harm would not have occurred absent defendants’ conduct. On the other hand, the appellate court’s mention of defendants’ ability to foresee certain results suggests that the appellate court was engaging in the policy-based legal cause inquiry. However, because this inquiry looks at what a reasonable person would foresee as the result of his conduct, not at what this specific defendant knew or should have known, the appellate court’s conclusion does not properly dispose of the question of legal cause.

The dealer defendants make a number of arguments under the general heading of causation. We consider two of them here. First, they argue that Illinois law does not permit liability to be imposed for public nuisance unless the defendant is in control of the instrumentality causing the nuisance at the time of injury. Second, they argue that their conduct is too remote from the alleged injury to be deemed a legal cause. Because we are reviewing a dismissal pursuant to a section 2–615 motion, our standard of review is 
de novo
. 
Wakulich
, 203 Ill. 2d at 228.

1. 
Control

Relying on the decision of the Ohio Supreme Court in 
City of Cincinnati
, the appellate court addressed the argument that defendants cannot be held liable in public nuisance for the harms alleged because they do not have control over the instrumentality at the time of injury:

“[I]t is not fatal to the public nuisance claim that defendants did not control the actual firearms at the moment that harm occurred. [Citation.] The Ohio Supreme Court stated: ‘[A]ppellant alleged that appellees control the creation and supply of this illegal secondary market for firearms, not the actual use of the firearms that cause injury. *** Just as the individuals who fire the guns are held accountable for the injuries sustained, appellees can be held liable for creating the alleged nuisance.’ ” 337 Ill. App. 3d at 17, quoting 
City of Cincinnati
, 95 Ohio St. 3d at 420, 768 N.E.2d at 1143.

Dealer defendants argue that the appellate court failed to apply Illinois law precluding public nuisance liability where the defendant does not control the alleged nuisance at the time of injury and, therefore, cannot effectively abate it. Defendants insist that control and proximate cause are distinct concepts and that Illinois courts have, for many decades, required both to be proven in nuisance cases. The control requirement, according to defendants, serves as a “boundary-setting limitation on liability.”

Plaintiffs acknowledge the general rule that when a defendant is blameless for the subsequent misuse of its product, it bears no legal responsibility for a nuisance subsequently created by those who have purchased the product. See, 
e.g.
, 
Traube v. Freund
, 333 Ill. App. 3d 198, 201-02 (2002) (holding that manufacturer of pesticide cannot be held liable in public nuisance for contamination of lake resulting from farmers’ use of the pesticide on adjacent property; and noting that “the absence of a manufacturer’s control over a product at the time the nuisance is created generally is fatal to any nuisance or negligence claim”). Plaintiffs argue, however, that neither the case law nor the Restatement imposes a control requirement in addition to the causation requirement and, further, that when cause in fact is proven, a defendant may be held liable if he substantially participated in the creation or maintenance of the nuisance, even if he no longer controlled the instrumentality. In effect, plaintiffs’ contention is that because defendants participate in transactions that eventually lead to gun violence in the city of Chicago, they are not “blameless” for the subsequent misuse of the firearms they sell.

This court has discussed the question of control in the context of a nuisance claim only once, in 
People v. Brockman
, in which we acknowledged the “oft-stated rule” that nuisance liability “requires that the defendant be in control *** either through ownership or control of the property.” 
People v. Brockman
, 143 Ill. 2d 351, 373 (1991) (citing cases from the appellate court and from other jurisdictions). The public nuisance at issue in 
Brockman
 was pollution caused by the illegal disposal of hazardous substances in a landfill. The defendant landfill operator filed a third-party complaint against certain of his customers who had been the source of the hazardous substances, seeking contribution towards the costs of removal. We concluded that although the customers’ control argument was compelling, “the differing policy interests attendant to our contribution statute require that we not regard ‘control’ as the dominant consideration in cases such as the one before us.” 
Brockman
, 143 Ill. 2d at 373. Thus, we concluded that:

“[P]rinciples of equity support our conclusion that control does not operate to bar a contribution claim based on violations of the Act which create a public nuisance. Where a proper claim for contribution may be stated, the fact that a contributing polluter lacked control over the premises will not defeat that claim. By our holding we do not advocate total disregard of the issue of control, for it may properly be a consideration in the apportioning of fault.” 
Brockman
, 143 Ill. 2d at 374.

In 
Brockman
, we recognized control as a “consideration” and an “issue,” but not as a prerequisite to the imposition of nuisance liability. Implicit in our holding, however, was a conclusion that although the “contributing polluters” did not have control over the property at the time abatement was to be undertaken, they did have control over the polluting hazardous substances at the time they contributed to the creation of the nuisance by depositing the substances in the landfill.

Plaintiffs rely on 
Brockman
 for the proposition that control is not a separate element of a public nuisance claim and, even if control is a consideration in apportioning fault, it should not be the dominant consideration when defendants had control over the instrumentality of the nuisance when they sold the firearms that subsequently created the alleged nuisance.

We find the analogy between the defendants in this case and the contributing polluters in 
Brockman
 unpersuasive. Our holding in 
Brockman
 was based on equitable considerations, specifically, concern about unjust enrichment:

“So valued are principles of fairness and the avoidance of unjust enrichment that even if a person who might otherwise be immune has contributed as a cause to the injury he should be liable in contribution. This is so even though he cannot be directly liable to the plaintiff.” 
Brockman
, 143 Ill. 2d at 373-74.

Plaintiffs have not sought recovery from these defendants under a theory of contribution. They do not suggest that fault be apportioned between these defendants and the individuals in direct control of the instrumentality–the lawbreakers who possessed and used the firearms in the city. Defendants will not be unjustly enriched if the lawbreakers are made to pay for their crimes without defendants’ contribution.

Finding no support in 
Brockman
 for relaxing the control requirement, if indeed such a requirement exists, we look to other authorities to determine whether the appellate court properly concluded that defendants’ lack of control over the firearms after the point of sale does not preclude imposition of liability for their participation in the creation of the alleged public nuisance.

Because the common law doctrine of nuisance has traditionally been tied to harms resulting from the use of land, the question of control has arisen most often when the defendant has “completely divested himself from any connection with the property involved.” 
Maisenbach v. Buckner
, 133 Ill. App. 2d 53, 55 (1971). In 
Maisenbach
, where a minor was injured by tripping over a fence, the former owners of the property, who had not installed the fence but had actively maintained it for 14 years, could not be held liable in nuisance because: “Where a landowner clearly has no right to control the property after he sells it to another, he likewise can have no duty to third persons injured in connection with the property after the sale.”
 Maisenbach
, 133 Ill. App. 2d at 56. This situation sits in contrast to the case in which “an owner who creates a nuisance and then leases the property with the nuisance attached.” 
Maisenbach
, 133 Ill. App. 2d at 54. Such an owner will be held responsible for injuries caused by the nuisance even though he does not have possession and control at the time of the injury. 
Maisenbach
, 133 Ill. App. 2d at 54.

A decade later, in 
City of Chicago v. Stern
, 96 Ill. App. 3d 264 (1981), the city sought injunctive relief to abate the operation of a “bawdy house” by several named defendants. However, the premises were owned by a corporation, not by the named individuals. The appellate court affirmed the trial court’s dismissal of the nuisance claim: “In the absence of proof of ownership, operation, or control of the premises by any defendant, the trial court properly found that equity could not intervene to abate the alleged nuisance existing on the premises,” even though the named individuals formed the corporation, owned it, and operated the “club” that featured nude dancing and other erotic entertainment. 
Stern
, 96 Ill. App. 3d at 267.

In 
Brunsfeld v. Mineola Hotel & Restaurant, Inc.
, 119 Ill. App. 3d 337 (1983), the plaintiff failed to state a cause of action for public nuisance against owners of property adjacent to the frozen lake upon which he was injured while snowmobiling. Although the property owners cooperated with individuals who constructed a motorcycle race track on the lake, and even allowed them to use their equipment to create and maintain the track, plaintiff pointed “to no act, structure, or device within defendant’s control which could constitute [a public] nuisance.” 
Brunsfeld
, 119 Ill. App. 3d at 345. The court explained:

“The creator of the nuisance is liable therefor [citation], as may be a person who continues or maintains a nuisance created by another [citation]; but where it is not shown that a person created or continued a nuisance, or that he owned, maintained, or controlled the premises on which it exists, such person has no responsibility therefor.” 
Brunsfeld
, 119 Ill. App. 3d at 345.

In each of these cases, the issue of control was inextricably linked to the ownership of land and to the rights and duties of a property owner. Control was relevant, not as an element of proximate cause, but as a remedial issue. These cases stand for the unremarkable proposition that an injunction will not issue, ordering a defendant to abate a nuisance upon the land, if he has no authority, by reason of ownership or possession, to enter upon the land. As such, these cases offer scant support for the imposition of a separate control requirement in public nuisance cases that are not predicated on the defendant’s use of land.

 Defendants call our attention to 
City of Bloomington, Indiana v. Westinghouse Electric Corp.
, 891 F.2d 611 (7th Cir. 1989), as an example of a case in which nuisance liability was precluded because the instrumentality of the nuisance was no longer in the control of the defendant. In 
City of Bloomington
, the court of appeals, applying Indiana law, affirmed the trial court’s dismissal of nuisance and other claims against Monsanto, the manufacturer of polychlorinated biphenyls (PCBs). Monsanto sold the PCBs to Westinghouse for use in manufacturing capacitors. Westinghouse improperly disposed of the toxic waste in various local landfills, and small amounts of PCBs were also discharged in the plant’s sewer effluent. 
City of Bloomington
, 891 F.2d at 613. The city sought damages and injunctive relief against both Westinghouse and Monsanto, under various theories of liability including public and private nuisance. 
City of Bloomington
, 891 F.2d at 612. In affirming the dismissal of the nuisance counts against Monsanto, the court observed that the city had not “been able to find any cases holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale.” 
City of Bloomington
, 891 F.2d at 614. Further, since the pleadings did not “set forth facts from which it could be concluded that Monsanto retained the right to control the PCBs beyond the point of sale to Westinghouse,” the court agreed with the district court’s conclusion that Monsanto could not be held liable on a nuisance theory. 
City of Bloomington
, 891 F.2d at 614.

We find 
City of Bloomington
 unpersuasive. Indeed, on similar facts, an Illinois court following the precedent established by this court in 
Brockman
 (143 Ill. 2d at 373-74) might have held that the city of Bloomington had stated a claim against Monsanto. See also 
City of Bloomington
, 891 F.2d at 619 (Cudahy, J., dissenting) (suggesting that the majority had confused participation in the creation of the nuisance with control over the instrumentality).

Control is not a separate element of causation in nuisance cases that must be pleaded and proven in addition to cause in fact and legal cause. It is, rather, a relevant factor in both the proximate cause inquiry and in the ability of the court to fashion appropriate injunctive relief. When the nuisance results from a condition or conduct upon land, control over the land is generally a necessary prerequisite to the imposition of liability. See 
Brockman
, 143 Ill. 2d at 373. However, when the nuisance results from the use or misuse of an object apart from land, or from conduct unrelated to a defendant’s use of land, lack of control of the instrumentality at the time of injury is not an absolute bar to liability.

In the present case, the dealer defendants had ownership and control of firearms at some point in the distribution chain. If a public nuisance later results from the illegal use of the firearms by third parties, liability in public nuisance is not necessarily precluded simply because defendants no longer control the objects. The types of injunctive relief sought (
i.e.
, requiring these defendants to obtain proof that a Chicago resident making a gun purchase has a place outside the city in which he can legally maintain the firearm; prohibiting repeat sales to the same customer within 30 days of a previous purchase) do not require them to be able to exert control over the firearms that have already left their possession.

As for the question of cause in fact, the second amended complaint contains detailed allegations regarding the dealer defendants’ participation in bringing about the alleged nuisance, specifically their conduct leading up to and at the point of sale. Dealer defendants remark that these allegations pertain only to police “sting” operations and not to actual sales of firearms that were subsequently used illegally in the city. The relevant inquiry is whether the harm would have occurred absent the defendants’ conduct or, in the alternative, whether defendants’ conduct was a material element and a substantial factor in bringing about the harm. 
Lee
, 152 Ill. 2d at 455. Where reasonable minds could differ, the question of whether the defendant’s conduct was a substantial factor or a material element is for the jury to decide. 
Lee
, 152 Ill. 2d at 455. We are unwilling to state as a matter of law that plaintiffs have failed to raise an issue of material fact with regard to cause in fact.

As for the question of legal cause, defendants’ lack of control over the firearms at the time of injury is related to their argument that their conduct was so far removed from the eventual criminal acts that, as a matter of policy, it would not be appropriate to hold them legally responsible. We now turn to that argument.

2. 
Remoteness

Dealer defendants argue that any nuisance resulting from the possession and use of firearms in the city is caused not by their conduct but by the independent, criminal acts of third parties. Defendants assert that their selling of firearms merely furnishes a condition by which the criminal acts of others are made possible and is, thus, too remote to constitute legal cause of a nuisance that results from the aggregate effect of many such acts. They further argue that under 
Riordan
 and 
Linton
, the criminal misuse of a firearm is not a foreseeable consequence of the lawful sale of firearms to the general public.

In response to defendants’ remoteness argument, the appellate court ruled that plaintiffs sufficiently pleaded “resulting injury” by alleging “facts that, notwithstanding actual knowledge that the guns would be brought into Chicago and used in crimes, the manufacturers, distributors, and dealers failed to alter their actions, thereby creating a public nuisance.” 337 Ill. App. 3d at 17-18. In reaching this conclusion, the appellate court relied upon section 824 of the Restatement and comment 
b 
thereto.

Section 824, however, does not address the element of proximate cause. Instead, it deals with the type of conduct essential to liability for public or private nuisance. An actor will be held liable for a nuisance if his conduct consists of: “(a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference” that constitutes the nuisance. Restatement (Second) of Torts §824 (1979). In the “ordinary case,” comment 
b
 instructs, liability for nuisance “arises because one person’s acts set in motion a force or chain of events resulting in the invasion.” Restatement (Second) of Torts §824, Comment 
b
 (1979). Further, “[s]o far as the actor’s liability is concerned, it is immaterial whether he does the acts solely in the pursuit of his own interests or whether he is acting for another, gratuitously, under contract or as the other’s servant or agent. It is enough that his acts are
 a legal cause of the invasion
.” (Emphasis added.) Restatement (Second) of Torts §824, Comment 
b
 (1979). Thus, section 824 and comment 
b
 do not provide the answer to the question of whether the alleged conduct of defendants constitutes a legal cause of the claimed nuisance. Rather, comment 
b
 merely poses the question–Is the conduct of these defendants a legal cause of the alleged interference with a public right? The answer to this question must be found elsewhere.

In cases involving claims of negligence or nuisance, Illinois courts draw a distinction between condition and cause. 
First Springfield Bank & Trust v. Galman
, 188 Ill. 2d 252, 257 (1999). If a defendant’s breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant’s creation of the condition is not a proximate cause of the injury. 
Briske v. Village of Burnham
, 379 Ill. 193, 199 (1942).

In 
Galman
, this court was urged to abandon this approach and to apply the proximate cause standard of 
Lee
 to all cases involving a question of proximate cause, even those in which the immediate cause of the injury is the subsequent, independent act of a third person. See, 
e.g.
, W. Keeton, Prosser & Keeton on Torts §42, at 278 (“ ‘Cause’ and ‘condition’ still find occasional mention in the decisions; but the distinction is now almost entirely discredited”). Rather than abandon our long-standing framework for the analysis of proximate cause, we instead harmonized our precedents with the proximate cause test articulated in 
Lee
. See 
Galman
, 188 Ill. 2d at 257-58. See also 
Abrams v. City of Chicago
, 211 Ill. 2d 251, 259 (2004) (restating the applicability of cause versus condition analysis to a special subset of proximate cause cases involving injuries caused by the intervening acts of third parties).

Under the 
Lee
 standard, as noted above, cause in fact exists if the defendant’s conduct is “a material element and a substantial factor in bringing about the injury.” 
Lee
, 152 Ill. 2d at 455. Legal cause, however, is “essentially a question of foreseeability.” 
Lee
, 152 Ill. 2d at 456. The relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his conduct. 
Lee
, 152 Ill. 2d at 456. This court has rejected the implication that the 
Lee
 test is incompatible with earlier decisions involving a “particular subset of cases,” in which subsequent acts of third parties constituted an intervening and efficient cause of the injury. See 
Galman
, 188 Ill. 2d at 259, citing 
Briske
, 379 Ill. 193 (village’s placement of barricade across vacated street was condition, not legal cause, of automobile’s collision with the barricade where intervening efficient cause was driver’s negligence); 
Merlo v. Public Service Co. of Northern Illinois
, 381 Ill. 300 (1942) (height and condition of wires was condition, not legal cause, of injury where efficient intervening cause was negligence of crane operator who caused crane to come into contact with wires); 
Thompson v. County of Cook
, 154 Ill. 2d 374 (1993) (county’s failure to post warning sign at dangerous curve was condition, not legal cause, of injury where efficient intervening cause of death of passenger was recklessness of drunken driver); see also 
Abrams
, 211 Ill. 2d at 260. This court concluded in 
Galman
 that when, as in these cases, plaintiff’s injury directly results from the subsequent, independent act of a third person, the “material and substantial element” test of 
Lee
 is applied by asking “whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct.” 
Galman
, 188 Ill. 2d at 259. As the 
Merlo
 court noted over 60 years ago:

“If the act of a third party is the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury. There may be more than one proximate cause of an injury. But if two wholly independent acts, by independent parties, neither bearing to the other any relation or control, cause an injury by one creating the occasion or condition upon which the other operates, the act or omission which places the dangerous agency in operation is the efficient intervening cause that breaks the casual connection and makes the other act or omission the remote and not the proximate cause of the injury.” 
Merlo
, 381 Ill. at 317.

Applying this analysis, this court in 
Galman
 determined that an illegally parked tanker truck was a cause in fact of the fatal injury of plaintiff’s decedent, but was not the legal cause. 
Galman
, 188 Ill. 2d at 259-60.

Having assumed, 
arguendo
, that the presence and use of illegal firearms can constitute a public nuisance, we must determine whether defendants’ conduct in selling firearms that eventually are taken into the city of Chicago is a legal cause of the nuisance. Legal cause will be found if reasonable persons in the retail business of selling firearms would have seen the creation of the nuisance in the city of Chicago as a likely result of their conduct. See 
Galman
, 188 Ill. 2d at 259. However, legal cause will not be found where the criminal acts of third parties have broken the causal connection and the resulting nuisance “is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong.” 
Merlo
, 381 Ill. at 317. Clearly, the individuals who illegally possess and use firearms in the city of Chicago are not under the control of the dealer defendants. The question then becomes entirely one of foreseeability–Is the creation of a public nuisance in the city of Chicago so clearly foreseeable that the sales practices of these dealers should be deemed a legal cause of the nuisance even though it results from the criminal acts of third parties?

Dealer defendants argue that this question was resolved by the appellate court in 
Riordan
 and 
Linton
. 
Linton
 was a personal injury case in which the court held that the manufacturer of a firearm had no duty to the particular plaintiff who was shot by a third party. 
Linton
, 127 Ill. App. 3d at 678-79. 
Riordan
 involved wrongful-death claims against the manufacturers and distributors of guns used in fatal shootings. The appellate court held that these defendants had no duty to the victims of crimes committed by third parties. 
Riordan
, 132 Ill. App. 3d at 646. Neither case discussed the element of causation and in neither case was the dealer who sold the gun a defendant, so we find these cases informative, but not dispositive, of the present case.

The City responds to the question of legal cause and the related remoteness argument by stating that the “entire object of the scheme alleged in the complaint is to exploit the demand for illegal firearms within Chicago. The complaint pleads not only foreseeability, but that defendants intend to market and distribute firearms in a manner than facilitates their unlawful use and possession in Chicago.” The city acknowledges multiple links in the causal chain between defendants’ actions and the alleged nuisance, but claims that the complaint “demonstrates exactly how each defendant has participated in distribution channels that supply grossly disproportionate numbers of guns to criminals in Chicago.”

The city also argues that 
Rowe v. State Bank of Lombard
, 125 Ill. 2d 203 (1988), is dispositive of this case. In 
Rowe
, this court stated that a defendant may be held liable in negligence if he creates a condition conducive to a foreseeable intervening criminal act. 
Rowe
, 125 Ill. 2d at 224. The condition at issue in 
Rowe
 was a criminal’s ability to gain entry to an office by using a master key that he had obtained while working as a construction laborer on the site. 
Rowe
, 125 Ill. 2d at 225. Under the circumstances alleged, which included previous crimes committed on the premises with no sign of forcible entry, this court held that an assault and murder “were within the scope of the foreseeable risk created by the inadequate control with regard to the master and grandmaster keys.” 
Rowe
, 125 Ill. 2d at 227. Because the issue under discussion in 
Rowe
 was the existence of a duty, not the existence of legal cause, 
Rowe
 is not dispositive of the present case.

A familiar treatise on torts warns that “[i]t must be remembered that the mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant.” W. Keeton, Prosser & Keeton on Torts §44, at 305 (5th ed. 1984). Further, “[e]ven though the intervening cause may be regarded as foreseeable, the defendant is not liable unless the defendant’s conduct has created or increased an unreasonable risk of harm through its intervention.” W. Keeton, Prosser & Keeton on Torts §44, at 305 (5th ed. 1984). These comments, contained in the section of the treatise discussing intervening causes, refer the reader to the earlier discussion of the standard of conduct: “Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law. W. Keeton, Prosser & Keeton on Torts §33, at 201 (5th ed. 1984). In “other situations,” however, the actor may have a duty of care for the protection of others. Such situations include situations in which the actor has a special responsibility for the protection of the plaintiff, perhaps arising by contract or founded upon a special relationship between the two, and where there is “an especial temptation and opportunity for criminal misconduct brought about by the defendant.” W. Keeton, Prosser & Keeton on Torts §33, at 201-03 (5th ed. 1984).

These excerpts from the treatise illustrate the link between the questions of the existence of a duty and the existence of legal cause. Both depend on an analysis of foreseeability. In the present case, the question is whether dealer defendants, given the nature of the product they sell, their awareness of Chicago ordinances regarding firearms, and their knowledge that some of their customers are Chicago residents, could reasonably foresee that the guns they lawfully sell would be illegally taken into the city in such numbers and used in such a manner that they create a public nuisance.

We conclude not. We agree with the conclusion of the appellate division of the supreme court of New York in 
Spitzer
: “defendants’ lawful commercial activity, having been followed by harm to person and property caused directly and principally by the criminal activity of intervening third parties, may not be considered a proximate cause of such harm.” 
Spitzer
, 309 A.D.2d at 103, 761 N.Y.S.2d at 201.

This result is consistent with other Illinois cases in which a defendant’s conduct was found to be so remote from the resulting injury that legal cause was not established. See, 
e.g.
,
 Thompson
, 154 Ill. 2d at 383 (inadequate warning of curve in road was merely a condition; injury was caused by intoxicated speeding driver). Although we have found no reported cases in which a nuisance claim has been dismissed at this stage for lack of legal cause, the case of 
Watson v. Enterprise Leasing Co.
, 325 Ill. App. 3d 914 (2001), in which the theory of liability was negligent entrustment, offers some interesting parallels to the present case. The defendant was a merchant who furnished a condition by which the injury was made possible. Specifically, Enterprise leased a vehicle to one party with the knowledge that it was likely to be driven by one or more third parties. The lessee entrusted the vehicle to a friend, from whom it was taken by yet another person. Eventually, an intoxicated minor took the keys from that person and caused an accident resulting in the death of his passenger. 
Watson
, 325 Ill. App. 3d at 917-20. Affirming the trial court’s grant of summary judgment for the defendant, the appellate court noted that the element of cause in fact had been satisfied. Absent the leasing of a car to the first individual, the death would not have occurred–at least not in an accident involving this particular vehicle. 
Watson
, 325 Ill. App. 3d at 924. The intoxicated driver would either not have driven at all and there would have been no accident, or he would have obtained the keys to another vehicle and the accident would have occurred, but would not have involved the defendant’s vehicle. Thus, the appellate court concluded, the “crux of the issue” was “legal cause, which revolves around foreseeability.” 
Watson
, 325 Ill. App. 3d at 924. The driver who caused the fatal injury, the court noted, was at least two steps removed from the person to whom Enterprise directly entrusted the car. In addition, the accident was caused by the criminal act of a third party. These events were not reasonably foreseeable. 
Watson
, 325 Ill. App. 3d at 925. Although the defendant furnished a condition that made the resulting injury possible, the creation of this condition was not the legal cause of the fatal accident because the defendant’s conduct was too remote to constitute legal cause. 
Watson
, 325 Ill. App. 3d at 925. As the appellate court observed, to “impose foresight on defendant under the particular circumstances present in this case would render it liable for anyone who drove the car, thus making it strictly liable.” 
Watson
, 325 Ill. App. 3d at 925.

The parallels to the present case are obvious. Dealer defendants, like the car rental company in 
Watson
, are in the business of providing a lawful product that may be used in unlawful ways, causing injury or death. Both the possession and use of firearms and the driving of motor vehicles are highly regulated by state law. In the present case, the existence of the alleged nuisance in the city of Chicago is several times removed from the initial sale of individual weapons by these defendants, just as the intoxicated driver was at least twice-removed from the defendant in 
Watson
.

The appellate court in 
Watson
 found it unreasonable to expect the car rental company to foresee a single accident caused by an intoxicated teenage driver who took the keys to the car without the permission of the person who had rented the car. In the present case, the claim of negligent entrustment has been dismissed and its dismissal has not been appealed. Thus, we are not faced with the question of whether a gun dealer might be held liable for negligently entrusting a weapon to an individual buyer when it is foreseeable that the buyer might allow a third party to possess or use the gun illegally. Instead, plaintiffs argue that it is foreseeable to these defendants that the aggregate effect of numerous sales transactions occurring over time and in multiple different locations operated by businesses with no ties to each other will result in the creation of a public nuisance in another city.

Finally, although these dealers’ sales of weapons create a condition that makes the eventual harm possible by putting these weapons in private hands, it is not at all clear that the condition would cease to exist even if these particular defendants entirely ceased selling firearms. Just as in 
Watson
, in which the intoxicated teenager managed to gain access to a set of car keys, those who intend to illegally possess and use firearms in the city of Chicago would still be able to obtain them. The manufacture and sale of firearms is legal. There is a market for these products that is served by thousands of dealers all across the country. The sales that would otherwise have been made by these dealers would be made by others. Ultimately, there would be a shift in market share between these dealers and others and, perhaps, an increase in the price of illegal weapons “on the street” as those intent on illegal gun ownership had to go further afield in search of weapons to buy.

Public policy also supports a conclusion that neither duty nor legal cause can be established with regard to these defendants. In 
Evans v. Shannon
, 201 Ill. 2d 424 (2002), we invoked public policy when we declined to impose a duty on a car rental company to check the drivers’ licenses of employees of the entities to whom it leased cars. We stated that a “duty so imposed would have far-reaching consequences, logically extending to every person who takes his or her vehicle for repair or servicing, and requiring that commercial and private car owners alike police the hiring practices of businesses with whom they deal.” 
Evans
, 201 Ill. 2d at 438. In the present case, the consequences of imposing a duty upon the dealer defendants to prevent the creation of a public nuisance in the city of Chicago by those intent on illegally possessing and using guns in the city are equally far-reaching. The same concerns underlie our conclusion that it is inadvisable as a matter of public policy to deem the dealer defendants’ actions a legal cause of the alleged nuisance.

Based on the pleadings before us, we conclude that the alleged public nuisance is not so foreseeable to the dealer defendants that their conduct can be deemed a legal cause of a nuisance that is the result of the aggregate of the criminal acts of many individuals over whom they have no control. This is one of those “ ‘instances in which a party may have contributed in some remote way [to the harm] and yet it is inappropriate to subject that party to tort liability.’ ” 
Spitzer
, 309 A.D.2d at 104, 761 N.Y.S.2d at 202 (quoting the lower court in the same case). See also 
Abrams
, 211 Ill. 2d at 262 (noting that while all traffic accidents are “to some extent remotely foreseeable,” the city’s failure to send an ambulance was not the legal cause of an accident that occurred while plaintiff was en route to the hospital in a private vehicle).

We turn, finally, to the remedial issues raised by defendants.

F. Remedies Sought by Plaintiffs

“It is generally conceded that a nuisance is remediable by injunction or a suit for damages.” 
Village of Wilsonville
, 86 Ill. 2d at 22.

1. 
Damages

Defendants’ remoteness argument has two facets. We considered, above, whether their conduct is too remote from the criminal acts of third parties to be considered a legal cause of the resulting harm. The second facet of defendants’ remoteness argument is that because any harm to the city and county is merely derivative of injuries to individuals who have been directly affected by gun violence, plaintiffs are too remote from the harm to seek monetary damages.

An award of damages in an action for nuisance is “retroactive, applying to past conduct,” and is proper if “it is unreasonable to engage in the conduct without paying for the harm done.” Restatement (Second) of Torts §821B, Comment 
i
 (1979). Under section 821(C) of the Restatement, a plaintiff may recover damages in an individual action for public nuisance only if he “suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.” Restatement (Second) of Torts §821C(1) (1979). The ability of an individual plaintiff to recover damages in a public nuisance suit is the result of “a tort remedy [having] been engrafted onto a crime,” the tort remedy being damages for trespass and the crime being the common law crime of public nuisance. Restatement (Second) of Torts §821C, Comment 
a
 (1979). No mention is made in section 821C or the comments that follow of the ability of a public official or entity to recover damages in an action for public nuisance brought on behalf of the general public.

Plaintiffs claim more than $433 million in operating expenses attributable to the alleged public nuisance during the years 1994-98. This amount includes the expenses of emergency communications and emergency response, health care provided to victims of gun violence, police investigations, and the prosecution and defense of those accused of crimes involving illegal possession and use of firearms. Plaintiffs also seek punitive damages against each defendant. Although acknowledging the difficulty of apportioning damages among the individual defendants, plaintiffs insist that damages are neither speculative nor particularly difficult to calculate. Plaintiffs also suggest that it is premature to consider issues related to damages at the pleading stage of this litigation. Plaintiffs assert that they may properly seek money damages because their public nuisance claim “is not based on economic losses flowing from damage to someone else’s person or property, but instead properly asserts the collective rights of the public.” “In short,” plaintiffs state, “in a public nuisance action, the government is never a remote or derivative plaintiff.” Plaintiffs’ position is that because abatement of the alleged nuisance by collecting unlawful firearms is not feasible, they are entitled to recover damages “representing the cost of providing governmental services made necessary by the widespread unlawful possession and use of firearms.”

a. Economic Loss Doctrine

Defendants assert that the economic loss doctrine adopted by this court in 
Moorman Manufacturing Co. v. National Tank Co.
, 91 Ill. 2d 69 (1982), and elaborated upon in
 In re Chicago Flood Litigation
, 176 Ill. 2d 179 (1997), bars plaintiffs’ claim for damages. In 
Moorman
, this court held that the plaintiff purchaser of a grain storage tank could not recover in tort from the manufacturer for solely economic loss due to defects in the tank. 
Moorman
, 91 Ill. 2d at 85-86. The theories of liability pleaded by the plaintiff in 
Moorman
 were strict liability, negligence, and innocent misrepresentation. 
Moorman
, 91 Ill. 2d at 72.

After citing the landmark case of 
Seely v. White Motor Co.
, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), this court adopted the reasoning of 
Seely
 to conclude that claims regarding “qualitative defects” in products “are best handled by contract, rather than tort,” whether the tort theory asserted is strict liability or negligence. 
Moorman
, 91 Ill. 2d at 75-76, 86. Further, allowing a manufacturer to be subjected to liability in tort for solely economic losses occasioned by a malfunction of its product “would, in effect, make a manufacturer a guarantor that all of its products would continue to perform satisfactorily throughout their reasonably productive life.” 
Moorman
, 91 Ill. 2d at 91. This would also encroach upon the prerogative of the legislature in enacting the sales provisions of the Uniform Commercial Code. 
Moorman
, 91 Ill. 2d at 91.

Plaintiffs argue that their claim is not based on the type of commercial interests for which the 
Moorman
 doctrine bars recovery. The damages they seek are not the type of economic losses associated with “disappointed commercial expectations” (
In re Chicago Flood
, 176 Ill. 2d at 200), such as “ ‘damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits,’ ” and “ ‘the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold’ [Citation.]” 
Moorman
, 91 Ill. 2d at 82.

The present case does not involve a claim by the purchaser of a product against the manufacturer or seller of that product for losses caused by a “qualitative defect.” Indeed, the firearms manufactured, distributed, and sold by defendants are alleged to have performed properly. 
Moorman
, therefore, does not provide the complete answer.

This court revisited the economic loss doctrine in 
In re Chicago Flood
, a case in which there was no privity of contract between the parties and no allegation that a product was defective. The plaintiffs included a class of individuals and businesses affected by the flooding of a tunnel beneath the Chicago River, allegedly caused by the negligence of the city of Chicago and one of its contractors. In addition, an insurance company, ITT Hartford, the subrogee of several other claimants, brought a separate action in nuisance. 
In re Chicago Flood
, 176 Ill. 2d at 183. Applying the 
Moorman 
doctrine, the trial court dismissed the nuisance claim as to Hartford’s subrogors who did not incur both an invasion of their property by the flood waters and resulting property damage. 
In re Chicago Flood
, 176 Ill. 2d at 187. On appeal, the appellate court held that the 
Moorman
 doctrine did not bar an otherwise proper nuisance claim. 
In re Chicago Flood
, 176 Ill. 2d at 188-89.

This court held that a plaintiff in a private nuisance action may recover all consequential damages flowing from an injury to the plaintiff’s person or property. 
In re Chicago Flood
, 176 Ill. 2d at 207. However, because this court found no reason to treat nuisance differently than any other tort, recovery of damages for solely economic loss would not be permitted. 
In re Chicago Flood
, 176 Ill. 2d at 207. We based this holding on the policy underlying the economic loss rule: that because “the economic consequences of any single accident are virtually endless,” a defendant who could be held liable for every economic effect of its tortious conduct would face virtually uninsurable risks, far out of proportion to its culpability. The economic loss rule operates to prevent such open-ended tort liability. 
In re Chicago Flood
, 176 Ill. 2d at 207 (referring to earlier discussion in the opinion). The present case, however, is distinguishable from 
Chicago Flood
, in which the theory of liability was private nuisance and the harm was the result of a single accident, rather than a course of conduct.

Plaintiffs cite 
Board of Education of City of Shepard v. A, C & S, Inc.
, 131 Ill. 2d 428 (1989), as an example of a case in which this court allowed a tort action to proceed, notwithstanding the fact that the plaintiff school boards were seeking damages from the defendant manufacturers and distributors of asbestos-containing materials. Recovery of the costs of asbestos abatement would not have been possible under a contract theory. After all, the defendants provided and satisfactorily installed a product that adequately performed its intended fireproofing and insulation functions. 
A, C & S
, 131 Ill. 2d at 451.

Moorman
 directed that a court consider the “nature of the defect and the manner in which the damage occurred” as a means of distinguishing between property damage, which would support a claim for economic damages, and purely economic loss, which would not. 
Moorman
, 91 Ill. 2d. at 82. Applying this two-part inquiry in 
A, C & S
, this court found that the nature of the defect was the presence of carcinogenic asbestos fibers on school premises. 
A, C & S
, 131 Ill. 2d at 445. The manner in which damage occurred was contamination, which was deemed a type of property damage on which a claim for economic damages could be based. 
A, C & S
, 131 Ill. 2d at 449. This court, therefore, declined to dismiss the school boards’ negligence and strict liability claims as barred by the 
Moorman
 doctrine. 
A, C & S
, 131 Ill. 2d at 451.

“Perhaps it is difficult, and may appear somewhat artificial, to fit a claim for asbestos damage within the framework which has been established for more traditional tort or contract actions. Indeed, the nature of the ‘defect’ and the ‘damage’ caused by asbestos is unique *** . Nonetheless, we do believe that this complaint has alleged sufficient facts to establish a tort action under the principles established in 
Moorman
; however, the holding in this case should not be construed as an invitation to bring economic loss contract actions within the sphere of tort law through the use of some fictional property damage.” 
A, C & S
, 131 Ill. 2d at 445.

Despite this warning, plaintiffs urge us to read 
A, C & S 
as creating an exception to the 
Moorman
 doctrine whenever it is alleged that a defendant’s conduct “creates an unreasonable threat to public health, safety, and welfare.” 
A, C & S
, however, does not represent an exception to 
Moorman
. Instead, 
A, C & S
 merely stands for the proposition that because contamination is a form of property damage, the cost of asbestos removal from a plaintiff’s property does not constitute a solely economic loss subject to the bar of 
Moorman
. See also 
Tioga Public School District #15 of Williams County, State of North Dakota v. United States Gypsum Co.
, 984 F.2d 915 (8th Cir. 1993) (holding that the economic loss doctrine did not bar plaintiff’s claim for damages for the costs of asbestos abatement). In addition, we note that 
A, C & S 
predates this court’s decision in 
In re Chicago Flood
, in which the recognized exceptions to the 
Moorman
 doctrine were listed. The exception urged by plaintiffs was not noted. 
In re Chicago Flood
, 176 Ill. 2d at 199.

Plaintiffs also cite several cases from other jurisdictions for the proposition that the economic loss doctrine does not apply when the defendant is alleged to have breached a duty to the general public. For example, in 
In re One Meridian Plaza Fire Litigation
, 820 F. Supp. 1460, 1480 (E.D. Pa. 1993), 
rev’d on other grounds
, 12 F.3d 1270 (3d Cir. 1993), the federal district court held that, under Pennsylvania law, the economic loss doctrine was not applicable to a public nuisance claim. 
One Meridian Plaza
, however, is not inconsistent with our result in 
In re Chicago Flood
, although the federal district court took a slightly different approach by linking the policy underlying the economic loss doctrine to the standing requirements for public nuisance claims. 
One Meridian Plaza
, 820 F. Supp. at 1480-81. The special harm requirement, which must be met in order for an individual to have standing to bring a public nuisance claim,

“is intended to serve the 
same purpose as the economic loss doctrine
: to limit liability arising from an event. Public nuisances, by definition, affect many people. If every person or entity injured from a public nuisance could recover economic or even property damages, liability could be exorbitant; thus only those plaintiffs who suffer special harm may recover.” (Emphasis added.) 
One Meridian Plaza
, 820 F. Supp. at 1481.

Plaintiffs in the present case can neither avail themselves of the standing conferred upon individuals under section 821(C)(2) of the Restatement on the basis of having suffered a particular harm, nor escape the strictures of the 
Moorman
 doctrine, because they have pleaded no injury to person or property.

Plaintiffs’ reliance on 
People Express Airlines, Inc. v. Consolidated R. Corp.
, 100 N.J. 246, 495 A.2d 107 (1985), is similarly misplaced. 
People Express
, like 
One Meridian Plaza
, involved a single catastrophic accident, specifically, a tank car accident in a rail yard that necessitated evacuation of nearby businesses due to the threat of explosion. 
People Express
, one of the affected businesses, suffered no property damage, but did incur economic losses from the shutdown. 
People Express
, 100 N.J. at 248-49, 495 A.2d at 108. The theories of liability pleaded were negligence, nuisance, and strict liability. 
People Express
, 100 N.J. at 250, 495 A.2d at 109. The Supreme Court of New Jersey expressed concern with the economic loss doctrine, which allowed some parties, but not others, to recover economic losses based on “the fortuitous occurrence of physical harm or property damage, however slight.” 
People Express
, 100 N.J. at 251, 495 A.2d at 109. On the other hand, the court found:

“It is understandable that courts, fearing that if even one deserving plaintiff suffering purely economic loss were allowed to recover, all such plaintiffs could recover, have anchored their rulings to the physical harm requirement. While the rationale is understandable, it supports only a limitation on, not a denial of, liability.” 
People Express
, 100 N.J. at 254, 495 A.2d at 111.

The limiting principle adopted by the New Jersey court was that of foreseeability. 
People Express
, 100 N.J. at 256, 495, A.2d at 112. Under the new rule, “a defendant who has breached his duty of care to avoid the risk of economic injury to particularly foreseeable plaintiffs may be held liable for actual economic losses that are proximately caused by its breach of duty.” 
People Express
, 100 N.J. at 267, 495 A.2d at 118. With regard to the nuisance claim, the court stated, the ability of an individual to recover solely economic losses under the new rule would be dependent on his standing to bring an action for public nuisance. 
People Express
, 100 N.J. at 259-60, 495 A.2d at 113-14.

The foreseeability exception to the economic loss doctrine formulated by the New Jersey court in 
People Express 
has not been widely adopted. In addition, although 
People Express
 was decided several years after 
Moorman
, it was decided more than a decade before 
In re Chicago Flood
. When this court ruled in 
In re Chicago Flood 
that the 
Moorman
 doctrine bars the recovery of solely economic damages in private nuisance, it implicitly rejected the approach taken in 
People Express
. We are not persuaded to adopt it now.

Although the economic loss doctrine is rooted in the theory of freedom of contract, it has grown beyond its original contract-based policy justifications of maintaining the fundamental distinction between contract and tort and protecting the freedom of parties to allocate risk by contract. 
In re Starlink Corn Products Liability Litigation
, 212 F. Supp. 2d 828, 842 (N.D. Ill. 2002). One of the early expansions of the economic loss doctrine beyond cases involving the parties to a contract was in the so-called “bridge” or “access cases.” 
Starlink
, 212 F. Supp. at 840. In these cases, the plaintiff businesses sought damages for lost profits after access to their places of business was prevented by the closure of a bridge or road. The theories of liability were negligence or nuisance. 
In re Chicago Flood 
was such a case. 
Starlink
, 212 F. Supp. at 840.

“Although they are nominally under the same economic loss rule, there are really some different policy issues driving the doctrine in access cases. The usual concerns about interfering with contract law and the parties’ freedom to allocate risks are not present because there is no contractual relationship. The parties are typically strangers and, with no foreknowledge of each other’s activities, had no opportunity to assess and allocate risks 
ex ante
. What these cases share in common with traditional economic loss doctrine jurisprudence is the lack of property damage. Moreover, because the only harms alleged were profits lost due to customer’s inability to access the premises, these damages fit neatly within the rubric of ‘disappointed commercial expectations.’ Courts also emphasize the speculativeness and potential magnitude of damages in access cases. *** So, although the original policy bases for the economic loss doctrine are not present, because of the type of injury, these cases seem to fit, at least linguistically, within the economic loss doctrine.” 
Starlink
, 212 F. Supp. at 840.

The damages sought by the plaintiffs in the present case are not lost profits and, thus, do not “fit neatly” within the rubric of the economic loss doctrine as applied in the access cases. However, the concerns regarding speculativeness and potential magnitude of damages that are present in the access cases are present here. We conclude that the damages sought by the plaintiffs are “solely economic damages” in the sense that they represent costs incurred in the absence of harm to a plaintiff’s person or property. See 
Starlink
, 212 F. Supp. at 841 (plaintiff cannot rely on harm to property belonging to others to demonstrate economic injury).

In sum, this court has never before been asked to determine whether the 
Moorman
 doctrine bars a claim for solely economic damages incurred by a city when it brings a claim of public nuisance on behalf of the general public, in the absence of physical harm to city property or other direct injury. The Restatement appears to limit recovery of economic damages in public nuisance suits to individual plaintiffs so affected by the public nuisance that they have standing to bring the action. Restatement (Second) of Torts §821(C)(1) (1979). We need not decide in the present case whether we agree with this approach, which has been adopted in other jurisdictions (
One Meridian Plaza
, 820 F. Supp. at 1481; 
Stop & Shop Cos. v. Fisher
, 387 Mass. 889, 897, 444 N.E.2d 368, 373 (1983) (individual plaintiff who suffered no damage to property may recover solely economic damages in public nuisance claim for obstruction of public way by demonstrating “special pecuniary harm,” not common to the general public)), because the plaintiffs here are public entities. In 
Chicago Flood
, this court concluded that there is no reason to treat claims of private nuisance differently from other torts
. In re Chicago Flood
, 176 Ill. 2d at 207. In the end, we see no reason to treat claims of public nuisance differently than claims of private nuisance. The 
Moorman
 doctrine does not permit an award of solely economic damages to the plaintiff public entities in this public nuisance action.

b. Municipal Cost Recovery Rule

The result we reach on the application of the economic loss doctrine is consistent with the result mandated by the municipal cost recovery rule, also called the “free public services doctrine,” under which public expenditures made in the performance of governmental functions are not recoverable in tort. The rule, where it has been adopted, is based, in part, on the constitutional doctrine of separation of powers. See, 
e.g.
, 
United States v. Standard Oil Co. of California
, 332 U.S. 301, 314-15, 91 L. Ed. 2067, 2075, 67 S. Ct. 1604, 1611 (1947) (declining to recognize cause of action by federal government to recover costs of injured soldier’s hospitalization and pay resulting from negligence of defendants; noting that Congress, not the Court, “is the custodian of the national purse,” and the “exclusive arbiter of federal fiscal affairs”).

This court has not had occasion to consider adoption of the municipal cost recovery rule. The single appellate court case to employ the rule, 
County of Champaign v. Anthony
, 33 Ill. App. 3d 466 (1975), held that the county could not recover from a criminal defendant the cost of providing protection to a witness against him. This court affirmed on other grounds. 
County of Champaign v. Anthony
, 64 Ill. 2d 532 (1976).

The seminal case on this doctrine is 
City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.
, 719 F.2d 322, 324 (9th Cir. 1983), in which the city attempted to recover from the railway the costs associated with emergency response after the derailment of tank cars carrying explosive gas. The city’s theories of liability were negligence and conduct of an ultrahazardous activity. 
City of Flagstaff
, 719 F.3d at 323. Affirming the district court’s dismissal of the complaint, the court of appeals held that “the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service.” 
City of Flagstaff
, 719 F.2d at 323 (applying Arizona law in a case of first impression). See also 
Koch v. Consolidated Edison Co. of New York, Inc.
, 62 N.Y.2d 548, 468 N.E.2d 1, 479 N.Y.S.2d 163 (1984) (in absence of statutory authority, city cannot recover wages, salaries, and overtime paid to police, fire, and other municipal employees as a result of citywide blackout caused by defendant’s negligence).

The decision in 
City of Flagstaff
 did not turn on the underlying theory of tort liability, or on the question of proximate or legal cause of the expenditures. Rather, the identity of the claimant and the nature of the cost combined to deny recovery. 
City of Flagstaff
, 719 F.2d at 324. As the court explained:

“Where such services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement. This is so even though the tortfeasor is fully aware that private parties injured by its conduct, who cannot spread their risk to the general public, will have a cause of action against it for damages proximately or legally caused.” 
City of Flagstaff
, 719 F.2d at 323.

Thus, the expectations of potential defendants, both business entities and individuals, and their insurers would be upset substantially if an entirely new scheme of liability were imposed. 
City of Flagstaff
, 719 F.2d at 323. Settled expectations are often upset when new tort doctrines emerge. Nevertheless, with regard to municipal services “a fair and sensible system for spreading costs is already in place.” 
City of Flagstaff
, 719 F.2d at 323.

“[G]overnmental entities themselves currently bear the cost in question, and they have taken no action to shift it elsewhere. If the government has chosen to bear the cost for reasons of economic efficiency, or even as a subsidy to the citizens and their business[es], the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.” 
City of Flagstaff
, 719 F.2d at 324, citing 
Standard Oil
, 332 U.S. at 314-17, 91 L. Ed. at 2075-76, 67 S. Ct. at 1611-12.

We agree that where a system already exists for the rational allocation of costs, and where society as a whole relies upon that system, there is little reason for a court to impose an entirely new system of allocation. This is particularly true where, as here, allowing recovery of the costs of routine police and other emergency services could have significant unintended consequences.

In addition to stating that such recovery would be permitted if it were authorized by statute or regulation, the court of appeals in 
City of Flagstaff
 noted that recovery has been allowed “where the acts of a private party create a public nuisance which the government seeks to abate *** and where the government incurs expenses to protect its own property.” 
City of Flagstaff
, 719 F.2d at 324. “These cases fall into distinct, well-defined categories unrelated to the normal provision of police, fire, and emergency services, and none are applicable here.” 
City of Flagstaff
, 719 F.2d at 324.

A, C & S
, one of the cases cited by the plaintiffs, is such a case. Plaintiffs suggest that this court approved the school boards’ recovery of costs as a consequence of a defendant’s wrongdoing. However, the plaintiff school boards in 
A, C& S
 were suing under ordinary tort principles as owners of damaged property, not as governmental entities seeking to recover the costs of the services they routinely provide to the public. 
A, C & S
, 131 Ill. 2d at 450-51. See also 
People ex rel. Department of Transportation v. City of Chicago
, 36 Ill. App. 3d 712, 714 (1976) (“it is well established that when the State brings an action to recover for damages to property, it stands in the same position as to rights and remedies as any other litigant”).

Other cases cited by plaintiffs involve various forms of environmental pollution, for which the costs of abatement are recoverable; or damage to public property, in which the city sues in tort as a property owner; and, thus, fall within one of the “distinct, well-defined categories unrelated to the normal provision” of public services described in 
City of Flagstaff
. In 
Wyandotte Transportation Co. v. United States
, 389 U.S. 191, 19 L. Ed. 2d 407, 88 S. Ct. 379 (1967), for example, the government was permitted to recover the costs of removing a sunken vessel from an inland waterway because such recovery was consistent with a federal statute that contained specific, but not exclusive, remedies for violations.

In 
City & County of San Francisco v. Philip Morris, Inc.
, 957 F. Supp. 1130 (N.D. Cal. 1997), plaintiffs were permitted to maintain an action for fraud against tobacco defendants in effort to recover costs of medical care provided to indigent residents for smoking-related illness. This result, however, was not reached as an exception to the municipal cost recovery rule. Rather, the court ruled that the California law, which bars recovery by one who pays medical expenses of another who has been negligently injured, does not apply to intentional torts such as fraud. 
City & County of San Francisco
, 957 F. Supp. at 1141.

Plaintiffs also rely on 
Ashcroft v. Kansas City Firefighters Local No. 42
, 672 S.W.2d 99 (Mo. App. 1984), in which the State of Missouri was permitted to sue the firefighters’ union in tort to recover the cost of deploying the state militia during an illegal strike. Authority for the award of damages was found in the state statute making such strikes illegal, which “implicitly consign[ed]” the recognition of a cause of action for violation of the statute and the creation of the proper remedy to the courts. 
Ashcroft
, 672 S.W.2d at 109. The Missouri court, however, expressly disclaimed any liability for damages under the theory of public nuisance on these facts. 
Ashcroft
, 672 S.W.2d at 114.

Plaintiffs also cite 
City of New York v. Taliaferrow
, 144 Misc. 2d 649, 544 N.Y.S.2d 273 (1989), in which the trial court ruled the operation of a house of prostitution a public nuisance and awarded $1 in compensatory damages and $100,000 in punitive damages to the city, pursuant to a state statute authorizing the imposition of civil penalties. No “municipal costs” were at issue because no compensatory damages were demonstrated. 
Taliaferrow
, 144 Misc. 2d at 653, 544 N.Y.S.2d at 277.

Plaintiffs also argue that the exception acknowledged in 
City of Flagstaff
, applicable to matters “unrelated to the normal provision of police, fire, and emergency services” (
City of Flagstaff
, 719 F.2d at 324), should apply when ongoing misconduct is so pervasive that it creates a public nuisance. They cite 
City of Cincinnati
, in which the Supreme Court of Ohio permitted the city to maintain an action for damages in tort against a group of defendants similar to those in the present case:

“Although a municipality cannot reasonably expect to recover the costs of city services whenever a tortfeasor causes harm to the public, it should be allowed to argue that it may recover such damages in this type of case. Unlike the train derailment that occurred in the 
Flagstaff 
case, which was a single, discrete incident requiring a single emergency response, the misconduct alleged in this case is ongoing and persistent. The continuing nature of the misconduct may justify the recoupment of such governmental costs. *** Moreover, even the 
Flagstaff 
court recognized that recovery by a governmental entity is allowed ‘where the acts of a private party create a public nuisance which the government seeks to abate.’ ” 
City of Cincinnati
, 95 Ohio St. 3d at 428, 768 N.E.2d at 1149-50, quoting 
City of Flagstaff
, 719 F.2d at 324.

See also
 City of Boston v. Smith & Wesson Corp.
, No. 199902590 (Mass. Super. July 13, 2000) (distinguishing 
City of Flagstaff 
on basis that it involved a discrete emergency).

In 
James v. Arms Technology, Inc.
, 359 N.J. Super. 291, 820 A.2d 27 (2003), a New Jersey appellate court offered several reasons for declining to apply the municipal cost recovery rule to a public nuisance claim against gun manufacturers, distributors, and dealers. First, the case upon which the New Jersey rule was based had subsequently been abrogated, at least in part, by statute. Second, the ongoing course of conduct alleged against these defendants was distinguishable from the single incident at issue in
 City of Flagstaff
. Third, the rule does not apply where a municipality seeks to recover the costs of abatement of a nuisance. And, finally, the rule has been “subject to recent criticism, given the economic realities faced by cities.” 
James
, 359 N.J. Super. at 327, 820 A.2d at 49-50.

We do not find these reasons persuasive. Unlike New Jersey, no Illinois statute authorizes the recovery sought by plaintiffs. Second, we reject the distinction between single, discrete disasters, such as fires and explosions, and the unfortunately frequent incidents of handgun violence as a meaningful basis for abrogating the rule. If anything, the need for emergency response to shootings is a day-to-day occurrence, well within the predictable need for law enforcement and other municipal resources, while the risk of an explosion or other disaster is unpredictable and may impose devastating costs on a local government. Such a “single incident” does not result in a merely “nominal expense” (
James
, 359 N.J. Super. at 326, 820 A.2d at 48) that can be spread across the tax base without difficulty, as these cases would suggest. Nevertheless, as a matter of public policy, the cost of responding to such disasters is borne by the taxpayers, absent any legislative authorization otherwise. It defies common sense to suggest that the more predictable the expense, the greater the ability of the city to recover its costs in tort. The potential unintended consequences of such a rule are staggering. We agree with defendants that when the need for emergency services in response to an alleged nuisance is ongoing, the municipal cost recovery rule is stronger, not weaker, because the legislature is better able to consider need for cost-recovery legislation than in cases of sudden disaster. If the legislature concludes that the costs of a certain public service should be borne by the parties whose conduct necessitates that service, rather than by the taxpayers in general, it has the ability to enact a statute expressly authorizing recovery of such costs. Third, since plaintiffs admit that abatement is not feasible and that the damages they seek do not represent the cost of abatement, the exception in 
City of Flagstaff 
for such recovery does not apply. And, finally, we are not persuaded by scholarly and judicial criticism of the rule, as reflected in plaintiffs’ argument that “[c]ompensatory damages may *** constitute the most effective relief available for past misconduct, both to compensate the City and the County and to establish a rule providing the firearms industry with an economic incentive to utilize more responsible marketing practices.” They may be correct, but this is a question for the legislature. We will not abandon the principles of 
Moorman
 and its progeny, and the sound logic underlying the municipal cost recovery rule, in order to create such an incentive.

We conclude, therefore, that even if plaintiffs properly pleaded a cause of action in public nuisance, money damages would not be available because the claimed damages do not represent the actual cost of abatement of the nuisance or compensation for actual harm to the city’s or county’s property.

2. 
Injunctive Relief

The issuance of an injunction is contingent on plaintiffs’ prevailing at trial on the merits of their claim. Concerns raised by defendants about the availability of a remedy at law and breadth of the injunctive relief sought are, therefore, merely speculative and we decline to address them.

Similarly, because this case has been resolved on other grounds, we have not considered defendants’ arguments that dismissal of this action is warranted on the basis the injunctive relief sought by plaintiffs would violate the commerce and due process clauses of the United States Constitution (U.S. Const., art. I, §8, cl. 3; amends. V, XIV) and the state constitutional provision addressing the powers of home rule units (Ill. Const. 1970, art. VII, §6). 
Lyon v. Department of Children & Family Services
, 209 Ill. 2d 264, 271 (2004).

IV. CONCLUSION

Plaintiffs and the 
amici
 supporting their position advocate expansion of the common law of public nuisance to encompass their novel claim. They anticipate our reluctance to expand nuisance liability in an area highly regulated by both state and federal law and urge that it is not only within our inherent authority, but it is also our duty, to construe the common law to aid a local government’s effort to protect its citizens from gun violence.

To do so, we would have had to decide each of the issues raised in this appeal in plaintiffs’ favor. In effect, we would have had to resolve every “close call” in favor of creating an entirely new species of public nuisance liability. Instead, after careful consideration, we conclude that plaintiffs have not stated a claim for public nuisance. Even granting, 
arguendo
, that a public right has been infringed, we conclude that their assertions of negligent conduct are not supported by any recognized duty on the part of the manufacturer and distributor defendants and that, under the 
Gilmore
 rule (
Gilmore
, 261 Ill. App. 3d at 661), their allegations of intentional conduct are insufficient for public nuisance liability as a matter of law. In addition, we hold that proximate cause cannot be established as to the dealer defendants because the claimed harm is the aggregate result of numerous unforeseeable intervening criminal acts by third parties not under defendants’ control. By implication, proximate cause is also lacking as to the manufacturer and distributor defendants, who are even further removed from the intervening criminal acts. Finally, we hold that plaintiffs’ action for damages is barred by the 
Moorman
 doctrine and the municipal cost recovery rule.

 Any change of this magnitude in the law affecting a highly regulated industry must be the work of the legislature, brought about by the political process, not the work of the courts. In response to the suggestion of 
amici 
that we are abdicating our responsibility to declare the common law, we point to the virtue of judicial restraint.

We, therefore, reverse the judgment of the appellate court and affirm the judgment of the circuit court, which properly granted defendants’ motion to dismiss.

Appellate court judgment reversed;

circuit court judgment affirmed.

JUSTICE FREEMAN, specially concurring:

For the reasons given in my special concurrence in 
Young v. Bryco Arms
, No. 93678 (November 18, 2004), I specially concur.

CHIEF JUSTICE McMORROW and JUSTICES FITZGERALD, KILBRIDE and RARICK join in this special concurrence.